SANTIAGO MARCANO RODRÍGUEZ y ÁNGEL MARCANO, demandantes y recurrentes, *v.* PEPSI COLA BOTTLING CO., demandada y recurrida.

*Número:* R-65-168   *Resuelto:* 22 de noviembre de 1967

*Raimundo Suárez Lazú*, abogado de los recurrentes; *Fiddler, González & Rodríguez* y *Manuel Hernández Penzol*, abogados de la recurrida.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Se trata de determinar (1) si Santiago Marcano Rodríguez era un ejecutivo de la recurrida de manera que de haber trabajado horas extras no exista obligación de pagárselas y (2) si Ángel Marcano, como cuestión de hecho, trabajó horas extras que no se le pagaron. Convenimos con el tribunal de instancia en su conclusión de que el primero era tal ejecutivo y que el segundo no trabajó las horas extras que reclama.

I.—Examinemos primero el caso de Santiago Marcano Rodríguez. Reclama el pago correspondiente a 6,192 horas extras trabajadas como mecánico de mantenimiento en la planta de embotellado de la recurrida durante 258 semanas, desde el 28 de marzo de 1953 hasta el 15 de febrero de 1963.

La prueba demostró que Marcano Rodríguez:

(a) percibía un sueldo de $100 semanales.

(b) fue contratado en 11 de marzo de 1958 como Jefe de Producción y "Como ejecutivo . . . trabajará las horas necesarias para lograr y mantener el buen manejo y funcionamiento de su departamento."

(c) era su responsabilidad ver que la maquinaria trabajase eficientemente y directamente realizaba algunas de las reparaciones que fuesen necesarias para mantener el equipo en buen estado de producción.

(d) estaba autorizado para firmar órdenes de compra por materiales que fuesen necesarios para llevar adelante las reparaciones hasta un máximo de $25. También compraba cepillos y material para lavar las botellas sin necesidad de consultar con la gerencia siempre y cuando que la orden no excediese de $25. Dicho límite fue alterado en la

siguiente forma: "[t]oda orden de compra que envuelva un desembolso de más de $100.00 deberá ser aprobado por el Sr. Julio César Pérez, Comptroller. Toda orden de compra que exceda de $500.00 deberá ser aprobada por el Sr. Mock, Presidente y el Sr. Pérez, Comptroller."

(e) rendía informes diarios sobre la producción de su departamento y supervisaba la labor que rendía el personal que en él trabajaba.

(f) siempre tuvo a su cargo y bajo su supervisión a no menos de 16 obreros, [1] siendo él responsable de la disciplina de éstos y de que realizaran el trabajo en forma eficiente.

(g) era responsable de que el producto tuviese una calidad adecuada.

(h) tenía facultad para controlar obreros y recomendaba las medidas disciplinarias que fuesen necesarias incluyendo la cesantía.

(i) cuando había alguna rotura en la maquinaria y a su juicio se hacía necesario que se contratase algún mecánico o electricista para realizar el trabajo, así lo recomendaba y su consejo y opinión eran seguidos por la gerencia.

(j) tenía facultad para autorizar que se trabajasen horas extras si a su juicio era necesario para mantener la producción de la fábrica.

---

[1] A la pág. 9 de la sentencia—Conclusiones de Derecho—primer párrafo, tercera oración, se dice:

". . . Habiéndose concluido igualmente que el deber primordial del querellante consistía en la dirección de un reconocido departamento o subdivisión de la empresa y que habitual y regularmente dirigía el trabajo de un número no menor de 6 empleados, nos encontramos por lo tanto con que el querellante en el caso de Santiago Marcano reunía los requisitos señalados en el Reglamento aplicable."

A la pág. 5 del alegato de los recurridos se señala que:

"[a]l trasladarse la planta a la Urbanización Industrial Villa Prades en mayo de 1959, se instaló un número mayor de máquinas nuevas y modernas, se redujo—la jornada de trabajo en la empresa—a solo un turno que constaba entre 18 a 20 empleados, todos bajo la supervisión directa de Santiago Marcano, como Jefe de Producción." Véase T.E. pág. 316.

(k) asistía a reuniones de la gerencia y allí daba sus opiniones en cuanto a las medidas que deberían tomarse para mejorar el funcionamiento y la eficiencia de la planta (recomendando la compra de equipo).

La prueba también demostró que el Departamento de Producción era un habitual reconocido departamento o subdivisión de la recurrida.

La Ley Núm. 379 de 15 de mayo de 1948 (29 L.P.R.A. secs. 271 a 288), es la que en parte provee para los derechos que aquí se reclaman. Dicha ley excluye en su Art. 19 (29 L.P.R.A. sec. 288), de la definición de "Empleado" a los ejecutivos, administradores y profesionales, entre otros, por lo que éstos no están cubiertos por las disposiciones sobre horas regulares y horas adicionales de trabajo. *Piñán* v. *Mayagüez Sugar Co. Inc.*, 84 D.P.R. 89 (1961).

El Secretario del Trabajo, al amparo de los poderes que se le conceden bajo el Art. 17 de la mencionada ley (29 L.P.R.A. sec. 286), promulgó un Reglamento que comenzó a regir en 15 de enero de 1952. En él se adoptó una definición del término "ejecutivo" a los fines de la exclusión que establece el mencionado Art. 19.(2) El mismo es una revisión del

---

(2) *Dicho Reglamento dispone que:*

"A los fines del art. 19 de la Ley núm. 379 de 15 de mayo de 1948 [29 L.P.R.A. sec. 288] y de la sec. 5 de la Ley núm. 289 de 9 de abril de 1946, según enmendada por la Ley núm. 130 de 27 de abril de 1950 [29 L.P.R.A. sec. 299] el término 'ejecutivo' significa:

(1) En actividades comerciales o manufactureras:

    (A) Cualquier empleado que reuna los siguientes requisitos:

        (i) que su deber primordial consista en la dirección de la empresa en que trabaja o en la dirección de un habitual reconocido departamento o subdivisión de la empresa;

        (ii) que habitual y regularmente dirija el trabajo de otros dos o más empleados de la empresa o de tal departamento o subdivisión de la misma;

        (iii) que tenga la autoridad de emplear y despedir otros empleados o cuyas sugestiones y recomendaciones sobre el empleo y despido de otros empleados y en cuanto al mejoramiento y ascenso o en relación con cualquier otro cambio de status de otros empleados hayan de recibir especial atención;

anterior y principalmente modificó a éste en el sentido que expresamos en *Piñán* v. *Mayagüez Sugar Co. Inc.*, supra, escolio 3; y *Morales* v. *Tribunal Superior*, 84 D.P.R. 123, 126, escolio 1 (1961).([3]) Como se habrá observado el citado Reglamento tiene dos apartados con distintos requisitos cada

---

(iv) que habitual y regularmente ejerza facultades discrecionales;

(v) que no dedique más del 20 por ciento de las horas trabajadas en la semana de labor a actividades que no estén directa e íntimamente relacionadas con el desempeño del trabajo descrito en el párr. (a), subpárrs. (i) al (iv) de este apartado. Disponiéndose que este subpárr. (v) no será aplicable en el caso de un empleado que esté él solo a cargo de un establecimiento independiente o de una rama del establecimiento físicamente separado del mismo, o que sea dueño de por lo menos el 20 por ciento del interés de la empresa en que esté empleado; y

(vi) que reciba por sus servicios una compensación fija (por día, semana, quincena o periodos mayores) equivalentes al sueldo semanal que resulte multiplicando por 60 el tipo mínimo por hora más alto que le sea aplicable por ley del Estado Libre Asociado de Puerto Rico o por decreto mandatorio de la Junta de Salario Mínimo de Puerto Rico a las actividades en conexión con los cuales ejerce sus funciones de ejecutivo, excluyendo alimentos, vivienda y otros servicios. Disponiéndose, sin embargo, que el salario semanal nunca deberá ser menor de $35 cuando dicha compensación computada en la forma ya expresada resultare o sea menor de esta suma, o cuando no hubiere salario aplicable por ley o por decreto.

(B)(i) Cualquier empleado cuyo trabajo cumpla con los requisitos dispuestos en el párr. (A)(i) y (ii) de este apartado (1); y

(ii) que reciba por sus servicios una compensación fija (por día, semana, quincena o periodos mayores) equivalente a un salario semanal no menor de $100, excluyendo alimentos, vivienda u otros servicios."

([3]) En *Morales* v. *Tribunal Superior*, supra, señalamos que:

"Para el período anterior al 15 de enero de 1952 cubierto por la querella en ausencia de una manifestación administrativa sobre el particular, consideraremos todos los hechos relevantes sobre la naturaleza y funciones del empleo . . . . Según indicamos en *Piñán* v. *Mayagüez Sugar Co.*, 83 D.P.R. 314 (1961) [*sic*] a partir del 15 de enero de 1952 la determinación de si el querellante era o no un ejecutivo depende de la concurrencia de los requisitos enumerados en el reglamento aprobado por el Secretario de Trabajo y promulgado en 26 de diciembre de 1951 para definir dicho término a los fines de la exclusión que establece el artículo 19 de la Ley núm. 379 de 15 de mayo de 1948, . . . ."

Véase, además, *Medina Vega* v. *Unión Obreros Cervecería*, 86 D.P.R. 642 (1962).

uno para que un empleado sea considerado como ejecutivo. El segundo apartado, o sea, el apartado (B), se refiere a cualquier empleado cuyo trabajo satisfaga los requisitos dispuestos en el párrafo (A) (i) y (ii) de dicho Reglamento y que reciba por sus servicios una compensación fija (por día, semana, quincena o períodos mayores), equivalente a un salario semanal no menor de $100, excluyendo alimentos, vivienda u otros servicios. Véase, *Sierra Berdecía v. Rosso*, opinión Per Curiam de 4 de junio de 1963.

El recurrente Santiago Marcano Rodríguez siempre percibió un salario semanal no menor de $100. Por tanto, a los fines de determinar si era o no un ejecutivo, según lo define el referido Reglamento, hemos de determinar, y ello es suficiente, si se reúnen los requisitos del apartado (B). *Sierra v. Rosso*, supra. [4]

Otro de los requisitos es que habitual y regularmente dirija el trabajo de otros dos o más empleados de la empresa o de un departamento o subdivisión de la misma. También satisface el reclamante este requisito según se desprende del récord del caso ya que siempre dirigió el trabajo de más de dos empleados del departamento de producción de la querellada.

El tercero de los requisitos que nos ocupa requiere que el deber primordial del empleado consista en la dirección de la empresa en que trabaja o en la dirección de un habitual reconocido departamento o subdivisión de la empresa.

La reglamentación local a que hemos venido refiriéndonos guarda semejanza a la forma en que el Administrador Fe-

---

[4] Es de notar que el tribunal de instancia en las conclusiones de derecho de su sentencia, pág. 9, escolio 3, señaló que:

"El querellante también reunía los otros requisitos enumerados en dicho Reglamento. Es inmaterial el análisis de los mismos en la consideración del caso de *Santiago Marcano*, en vista de que el salario del querellante era de $100 semanales en dicha empresa. . . ." (Énfasis en el original.)

deral ha descrito a un empleado que ocupa un empleo con capacidad *bona fide* de ejecutivo. [5] *Matos Velázquez* v. *Proctor Manufacturing Corp.*, 91 D.P.R. 45 (1964). Véase el escolio 2.

Apunta el recurrente que: .

(1) al concluir el tribunal de instancia que "era su responsabilidad ver que la maquinaria trabajase eficientemente y directamente realizaba algunas de las reparaciones que fuesen necesarias para mantener el equipo en buen estado de producción", quedó establecido como cuestión de hecho que la responsabilidad principal del recurrente estaba relacionada con la maquinaria propiamente y no con el personal. La prueba no justifica esta conclusión. El trabajo eficiente de la maquinaria necesariamente incluía las otras actividades del recurrente relacionadas con el personal bajo su supervisión y con la cantidad y calidad de la producción. Si bien aparece que el recurrente realizaba reparaciones, resulta evidente que esta actividad no podía requerir la mayor parte de su tiempo ni ser su más importante responsabilidad pues se trataba de maquinaria nueva y además aparece del récord

---

[5] La sec. 541.103 del Reglamento Federal (29 C.F.R. 541.103) dispone que:

"La determinación de que la función principal de un empleado es la de administración debe basarse en todos los hechos de cada caso en particular. El tiempo dedicado a desempeñar las funciones administrativas sirve de guía útil para determinar cuál es su función principal. En el caso corriente puede adoptarse como regla empírica el que la función primaria significa la mayor parte, más del 50% del tiempo del empleado. De modo que un empleado que dedica más del 50% de su tiempo a la función administrativa, tiene ésta como su responsabilidad principal. El tiempo por sí solo no es la única medida. En circunstancias en que el empleado no dedique más del 50% de su tiempo a labores gerenciales, puede, sin embargo, tener éstas como su responsabilidad principal cuando otros hechos pertinentes sostengan esa conclusión. Algunos de estos hechos pertinentes son la relativa importancia de la función gerencial en comparación con otros tipos de deberes, la frecuencia con que el empleado ejerce facultades discrecionales, su relativa independencia de la supervisión de otros y el salario pagado a otros empleados por la clase de trabajo no exento realizado por el supervisor."

que tenía autoridad para utilizar los servicios de mecánicos y electricistas en relación con reparación de la maquinaria.

(2) que la autoridad de realizar compras de materiales hasta $25 y de rendir informes diarios son facultades que puede darse a un mecánico o conserje. *Piñán* v. *Mayagüez Sugar Co. Inc.*, supra. Como hemos indicado antes, esta facultad era mucho más amplia y sólo era una de muchas otras responsabilidades gerenciales del recurrente. Se distingue del empleado en *Piñán*, supra, en que éste era un mero listero con facultades limitadas el conjunto de las cuales no justificaba concluir que el empleado era un ejecutivo.

(3) que la conclusión del tribunal de instancia de que el recurrente "Asistía a reunión de la gerencia y allí daba sus opiniones en cuanto a las medidas que debieran tomarse para mejorar el funcionamiento y eficacia de la planta" unido al hecho de que el recurrente Santiago Marcano fue enviado por la recurrida a tomar un curso o adiestramiento para operar la máquina nueva de embotellar, no deja lugar a dudas que este recurrente era esencialmente un mecánico experto, operador de las máquinas encargado del funcionamiento de la planta. Este argumento es esencialmente el que se adujo bajo el primer apuntamiento.

(4) que la prueba documental ofrecida por la recurrida es demostrativa de la práctica de los patronos de "fabricar ejecutivos"; que Santiago Marcano era un ejecutivo en papel pero en la realidad era un mecánico experto, un troquelero con algunos poderes sobre otros empleados que no eran otra cosa que sus ayudantes; que era lo que se conoce como un supervisor o capataz que trabaja (*working foreman*); que en casos como éste se impone una interpretación restrictiva. *Piñán*, supra. Señala que hubo prueba testimonial de que Santiago era un mecánico, prueba que no fue controvertida por la de la recurrida.

El récord demuestra que la situación no es la expuesta en el párrafo anterior, sino que el tribunal de instancia

estuvo justificado en concluir lo contrario. Un testigo declaró que estuvo en la vieja planta de la recurrida tres o cuatro veces en un período de 15 días y en esas ocasiones vio a Santiago Marcano realizando labores de mecánico; luego visitó la nueva planta de la recurrida y allí vio a dicho empleado haciendo la misma labor. Como el testigo era un investigador del Departamento del Trabajo que fue a la vieja planta de la recurrida a realizar una investigación relacionada con la querella de otro empleado, el hecho de que en esas pocas ocasiones viese a Santiago Marcano trabajando en la maquinaria no justificaba concluir que éste era un mero mecánico. Es de notarse que este testigo investigaba la naturaleza del cargo de un querellante que era precisamente el antecesor en la plaza que entonces ocupaba Santiago Marcano. Sin embargo no testificó sobre el resultado de su investigación y sobre la conclusión a que llegó sobre la naturaleza del cargo.

Iluminado Rodríguez testificó que era un operador de máquina y ayudante de mecánico de la recurrida; que no recuerda algún otro mecánico además de Santiago Marcano y Ángel Marcano; que éstos eran mecánicos torneros, electricistas y soldadores; el único que trabajaba en reparación de máquinas era Santiago Marcano; que el testigo trabajaba de siete de la mañana a doce y de una a cuatro de cada día pero tenía que quedarse hasta las siete de la noche reparando máquinas en la vieja fábrica junto con los dos Marcanos; que las roturas de máquinas era cosa de todos los días en la vieja fábrica y muy pocas, "menísimas" en la nueva; que como en ocasiones, si la maquinaria se rompía temprano, salía a la hora regular de salida, a las cuatro de la tarde; no recordó cuántas veces a la semana o al mes salía después de las cuatro pero podría ser que trabajase de 3 a 4 horas extras 4 veces a la semana. En contrainterrogatorio no recordaba que fue ascendido a jefe de uno de los tres turnos de producción en la fábrica vieja y se negó a admitirlo. No

recordaba el memo dirigídole a ese efecto, ni si pertenecía a la Unión o no en la vieja fábrica ni si allí le descontaban la cuota de la Unión. No recordó que Santiago Marcano, como Jefe de Producción, le dirigió un memorando al testigo como jefe del primer turno informándole que no se trabajaría en determinado sábado pero admitió que recibió otros por el estilo; en cuanto a si firmó memorandos como jefe de turno testificó que le bajaban unos papeles de arriba de la recurrente para que él los firmara y los firmó, indicando que en el primer turno de un sábado no se trabajaría debido a reparaciones. No recuerda si le pagaron por trabajar horas extras. Aparece que sí le pagaron, de una estipulación de las partes. A duras penas admitió haber recibido un memorando de la recurrida en que se le informaba de un aumento de sueldo debido a la recomendación al efecto de Santiago Marcano. Admitió que sólo se podían trabajar horas extras mediante autorización pero insistió que ésta la daba el gerente general no obstante reconocer las iniciales de Santiago Marcano en su tarjeta de entrada y salida aprobando que el testigo trabajase horas extras. Admitió que cuando se rompía una máquina veía gente de afuera "y miraba por ahí . . . ellos no hacían nada . . . el que hacía era el Sr. Marcano . . . . Allí iba personal y miraba las máquinas . . . entonces indicaba el Sr. Morán lo que había que hacer. . . ."

La forma que este testigo testificó, su actitud en la silla de los testigos, su memoria acomodaticia y sus evasivas, justificaron que el tribunal de instancia no diese crédito a su testimonio.

Anselmo Santiago testificó, en síntesis, que atendía la Unión en la Pepsi Cola; que la mayor parte del tiempo vio a Santiago Marcano soldando o "bregando con herramientas"; que Ángel Marcano hacía lo mismo; que ellos dos hacían las reparaciones de las máquinas; que trabajaban en el taller y en las máquinas; que ellos no formaban parte de la Unión porque no estaban incluidos en la definición de unidad con-

tratante aunque ésta incluía a los mecánicos; que en la planta de producción no había ningún jefe inmediato, los obreros trabajaban solos. Admitió que en los demás departamentos había supervisores. A insistencias del abogado de la recurrida y luego de muchas evasivas admitió haber recibido un memorando firmado por Marcano como jefe de producción. También admitió que el convenio colectivo excluía a capataces, supervisores y jefe de mecánicos. Testificó que nunca vio a Iluminado Rodríguez trabajando de ayudante de los Marcanos y sí atendiendo una máquina llenadora, y una que otra vez las cajas.

A la luz del testimonio prestado por el anterior testigo, no podemos concluir que el tribunal de instancia incidió al no prestarle crédito.

Las conclusiones del tribunal de instancia sobre la actividad gerencial de Santiago Marcano encuentran amplio basamento en el extenso contrainterrogatorio del propio Marcano, en el testimonio del Presidente y Gerente General de la recurrida y en la cuantiosa prueba documental. Es evidente que este recurrente dedicaba mucho menos del 50% de su tiempo a trabajar de mecánico pues se trataba de maquinaria nueva en que las reparaciones eran ocasionales y de poca importancia. Hubo prueba de que se estimaba que Santiago Marcano dedicaba de un 5 a un 10% a soldar y que en el torno trabajaba muy rara vez.

II.—Como los recurrentes sometieron la reclamación por horas extras de Ángel Mercado a base de la misma prueba, no tenemos fundamento para concluir que el tribunal de instancia incidió al concluir que no procedía esta reclamación.

*En vista de lo expuesto, se confirmará la sentencia dictada en este caso por el Tribunal Superior, Sala de San Juan, en 4 de agosto de 1965.*