EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* VICENTE AYALA ORTIZ, acusado y apelante.

*Número:* CR-67-134      *Resuelto:* 2 de abril de 1969

*César Andréu Ribas,* abogado del apelante; *Rafael A. Rivera Cruz, Procurador General,* y *Elpidio Arcaya, Procurador General Auxiliar,* abogados de El Pueblo.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

Con motivo de unos disparos de arma de fuego en una calle pública del Barrio Obrero de Santurce que hirieron a un joven en el abdomen y atravesaron el zapato de otro, el apelante Vicente Ayala Ortiz fue arrestado, luego de determinarse contra él causa probable por dos delitos de ataque para cometer asesinato y por dos infracciones a los Arts. 6 y 8 de la Ley de Armas. En la vista preliminar, el tribunal de instancia dictaminó que no había prueba suficiente para procesar al apelante por los delitos de atentado a la vida y sí por las infracciones a los Arts. 6 y 8 de la Ley de Armas. El Hon. Guillermo A. Gil, Juez del Tribunal Superior, confirmó el dictamen de que no existía prueba suficiente para procesar al apelante por los delitos de ataque para cometer asesinato. Luego de celebrarse el juicio en la Sala de dicho tribunal presidida por el juez Hon. Gerardo Carreira Más, fue hallado culpable de las infracciones a los Arts. 6 y 8 de la Ley de Armas, siendo condenado a cumplir concurrentemente las penas de un año de cárcel y de dos a cuatro años de presidio, las cuales fueron suspendidas bajo determinadas condiciones de acuerdo con la Ley Núm. 259 de 3 de abril de 1946 (34 L.P.R.A. sec. 1027).

En apelación apunta que el tribunal de instancia o el jurado, o ambos incidieron (1) al negarle al apelante un juicio justo e imparcial al hacer el juez sentenciador ciertas manifestaciones en presencia del jurado que necesariamente indicaban su opinión sobre la prueba y el carácter de los testigos; (2) al encontrarlo culpable cuando el arma no fue ocupada ni

debidamente descrita; (3) al darle entero crédito al testigo Agustín Luna Roque quien admitió encontrarse ebrio en el momento en que ocurrieron los hechos que motivan el proceso, negando así al apelante el beneficio de duda razonable; y (4) al hacer el juez sentenciador manifestaciones ante el jurado de que iba a castigar al testigo de cargo Pascual Oyola Sánchez por desacato por perjurio, como así lo hizo luego, al solicitar al alguacil en presencia del jurado que le trajera el Código Penal a la Sala.

Relacionamos a continuación la prueba de cargo:

1.—Antonio García Tapia, luego de testificar que el día 30 [sic] de febrero de 1966, a eso de las 10:30 de la noche mientras se encontraba en la calle Principal del Barrio Obrero de Santurce, frente al bar conocido por La Cuerda Floja vio al apelante allí "porque me dijeron que así era que se llamaba". Su interrogatorio sigue así:

"HON. FISCAL:

P. Qué pasó allí esa noche que le llamara la atención?

R. Estaba hablando allí y vi allí al acusado, como ya está acusado, y llamó a Cheguán.

P. Quién fue el que fue allí, quién?

R. El señor allá, Vicente Ayala.

P. Qué pasó?

R. El llegó y le dijo a él 'este vamos a arreglar esto'.

P. A quién le dijo esas palabras?

R. Al agraviado.

P. Quién es el agraviado?

R. José Juan.

P. Ese es Cheguán?

R. Sí señor.

P. Le dijo qué?

R. Que ahora era que iban a arreglar cuentas.

P. Qué pasó entonces?

R. Le hizo un disparo a los pies y otro al estómago.

P. A Cheguán?

R. Sí señor.

P. Y con qué le hizo esos dos disparos?

R. Con un revólver niquelado, cañón corto.

P. Un revólver niquelado cañón corto?

R. Sí.

P. Eso usted lo vió?

R. Sí señor.

P. Y usted vió a ese, ve al acusado Vicente Ayala Ortiz cuando esos dos disparos?

R. Como le dije ahora, se acusó a él porque dijeron que había sido él.

P. Usted no sabe si fue él o no?

R. *Lo digo que fue él porque dijeron; pero yo a él no lo conocía tampoco ni lo identifiqué allí, sino en el cuartel.*

P. Usted no lo identificó en el cuartel?

R. Me dijeron había estado y lo fueron a buscar.

P. Usted no sabe la persona que hizo los disparos?

R. *La persona que hizo los disparos era una persona más alta que él también y más blanco.* (Énfasis nuestro.)

Lcdo. Andréu Ribas:

Más qué?

R. Más blanco."

Luego de leer su propia declaración jurada en que aparece el testigo declarando que fue el apelante quien hizo los disparos, testificó así:

"Hon. Fiscal:

P. Si es o no cierto que no fue Vicente Ayala Ortiz sino uno más blanco, alto, que se llama Bullín?

R. Sí señor.

P. Y en su declaración jurada declaró fue Vicente Ayala Ortiz?

R. Fue Vicente Ayala Ortiz porque me dijeron así era que se llamaba.

Hon. Juez:

P. La persona, olvídese del nombre, que hizo los disparos quién es?

R. *La persona que hizo los disparos le dije, quien lo hizo es más alto que él.*

P. *Entonces no es este acusado?*

R. *No señor, Perdón, porque yo dí ese nombre así pero yo*

*sé que para mí no fue él porque la persona era más alta y blanco.*
(Énfasis nuestro.)

HON. FISCAL:

P. Sin embargo en la declaración bajo juramento dijo que era Vicente Ayala Ortiz?

R. Porque me dijeron había sido él, el nombre ese pero *para mí y para Dios sé que no fue él.*" (Énfasis nuestro.)

2.—El interrogatorio de Pascual Oyola Sánchez se condujo en parte así:

"P. Usted conoce o sabe quién es Vicente Ayala Ortiz?

R. Bueno yo lo conozco a él por el nombre.

P. El está presente en sala en el día de hoy, hace el favor de señalarlo?

R. Yo no puedo decir quien es.

HON. JUEZ:

P. Esa persona que usted ahora conoce con el nombre de Vicente Ayala Ortiz dónde está?

R. Ese señor que está presente.

P. Entonces cómo dice que no sabe. Vamos adelante.

. . . . . . . .

P. Y usted vió allí, le pregunto, esa noche, si es que lo vió a ese señor que está ahí?

R. Bueno no le puedo decir seguro porque yo según lo conocí a él por Bullín.

HON. JUEZ:

Que si vió esa persona que se conoce por Bullín?

R. No le puedo decir porque yo no lo ví muy bien. No estoy muy seguro.

HON. FISCAL:

P. A qué persona fue la que usted vió que usted dice no está muy seguro?

R. Bueno no estoy seguro.

P. Y qué fue lo que pasó allí, si algo pasó allí?

R. Bueno nosotros nos encontrábamos conversando con José Juan, hablando varias palabras y entonces llegó un individuo que lo conozco por Bullín y entonces le dejo 'vamos a arreglar esto ahora' y sacó un revólver.

HON. JUEZ:

P. Llegó un individuo que conoce por Bullín.

R. Por el nombre es que lo supe.

P. Que usted conocía por Bullín?

R. Conocía por Bullín.

P. Yo no entiendo, lo conocía por Bullín o por el nombre?

R. Por el nombre.

P. Por qué nombre lo conocía?

R. Por el nombre porque lo había hablado allí, se llamaba Bullín el individuo.

P. Ese individuo?

R. Yo conocí un tal Bullín pero no sé el . . .

P. Conoce más de un Bullín?

R. Yo los he visto de vista mucho.

P. A quién ha visto de vista?

R. La gente cuando pasan por allí que yo he hablado con amistades mías.

P. A quién ha visto muchas veces?

R. Muchas personas.

P. A ese Bullín lo ha visto muchas veces?

R. Sí.

P. Dónde está el Bullín ese que usted, descríbaselo a las damas y caballeros del jurado cómo es?

R. No le puedo identificar muy bien porque yo le digo que con amistades mías han estado hablando le conozco por Bullín.

P. Esa persona que ha conocido por Bullín descríbanoslo.

R. Yo no lo he visto muy bien.

P. No dice lo ha visto pues muchas veces?

R. No lo puedo identificar muy bien.

HON. FISCAL:

P. Oiga, y qué pasó allí, dígame?

R. Bueno nosotros nos encontrábamos hablando varias personas, yo me encontraba con José Juan y entonces llegó un individuo que lo conozco por Bullín . . .

P. Usted lo vió bien a ese individuo?

R. No lo vi bien.

P. Cómo sabe era Bullín?

R. Por el nombre, señor.

P. Llegó un individuo y dice 'yo lo conozco por Bullín', cuando usted lo vió sabía era Bullín?

R. No estoy muy seguro si era Bullín.

P. Y qué pasó?

R. Bueno, sacó un revólver de la cintura niquelado y le tiró un tiro hacia las piernas. Dijo primero: 'esto hay que arreglarlo' y luego tiró otro a la barriga.

P. A quién tiró?

R. A José Juan.

P. Y qué pasó después?

R. Entonces luego junto con nosotros, a uno de ellos le tiró dos tiros y le raspó el zapato y le tiró a José Antonio también.

P. Y qué pasó entonces?

R. Luego después de esa él embaló a correr y se metieron en un carro Chevrolet así, no sé si andaba con otro.

P. Quién se montó?

R. El señor ese que lo conozco por Bullín.

HON. JUEZ:

P. Ese señor que usted conoce por Bullín es un ser humano, un fantasma, un negro, un blanco?

R. El nombre.

P. Ese que conoce por Bullín cómo era, si era un hombre blanco o un hombre de color?

R. Según yo lo ví en la forma mía era un hombre flaco alto.

HON. JUEZ:

Adelante fiscal.

HON. JUEZ:

P. Usted tiene más de 18 años?

R. Dieciocho.

P. Ya cumplidos?

R. Sí.

HON. JUEZ:

Me alegro. Marshal tráigame el Código Penal. Adelante.

LCDO. ANDRÉU RIBAS:

Vamos a pedir se retire el jurado.

HON. JUEZ:

Como no. Retire el jurado."

Retirado el jurado el abogado de la defensa manifestó al tribunal lo siguiente:

"HON. JUEZ:

Qué cuestión.

LCDO. ANDRÉU RIBAS:

Ahora se la voy a plantear. Vuestro Honor, la cuestión que voy

a plantear es que entiendo Vuestro Honor, que Su Señoría ha dicho, así debe aparecer del récord, mientras declara este testigo, Su Señoría ha interrumpido el interrogatorio del fiscal para decirle al testigo, preguntarle primero después de hacer ciertas expresiones 'mire es un ser humano . . .'

HON. JUEZ:

Todo eso está en récord.

LCDO. ANDRÉU RIBAS:

Delante del jurado; ha procedido a preguntarle la edad de él, cuando dice 18 años dice 'me alegro' y manda a buscar el Código Penal, delante del jurado, y la defensa, con el mayor respeto que le tiene a Su Señoría y como magistrado le dice a Su Señoría que a su juicio Su Señoría está perjudicando los derechos de este acusado cuando oyendo al testigo con la frase que acaba de decir, un hombre flaco y alto grande, Vuestro Honor interrumpe el interrogatorio para hacer todas esas manifestaciones.

.     .     .     .     .     .     .     .

LCDO. ANDRÉU RIBAS:

Pido que no haga esas cosas porque me está perjudicando mi cliente. Su Señoría es el árbitro de la contienda pero no es parte y está actuando en esta forma dando la impresión al jurado que usted lo que acaba de decir este señor lo está rechazando, que va a encausarlo por desacato o perjurio.

.     .     .     .     .     .     .     .

LCDO. ANDRÉU RIBAS:

Pido a Su Señoría que por favor, cualquier actuación vaya a tomar contra este testigo, si es que tiene base para ello, lo haga sin indicarlo ante el jurado."

Luego de leérsele su declaración jurada el interrogatorio continuó así:

"HON. FISCAL:

P. Pregunto si declaró: 'mientras hablamos llegó un individuo conocido por Bullín, ahora me entero es Vicente Ayala Ortiz, y le dijo a José Juan "esto tiene que arreglarse" y sacó . . .'

R. Sí señor.

P. Eso lo declaró bajo juramento?

R. Sí señor.

P. Qué explicación tiene que dar a eso?

R. Cómo qué explicación?

P. Cómo usted explica?

R. Explico de lo que está apuntado ahí. De lo que falta.

HON. JUEZ:

De lo que falta no.

R. Dónde está.

HON. FISCAL:

P. Que la persona que había hecho los disparos era Bullín, que luego se enteró se llamaba Vicente Ayala Ortiz.

R. Me enteré porque en la Corte lo supe, en Fiscalía.

P. Esa es la explicación suya?

R. Sí señor.

P. Y usted habló con algún abogado o con el acusado o con algún familiar del acusado o con alguna persona en relación con este caso?

R. No señor.

.      .      .      .      .      .      .      .      .

LCDO. ANDRÉU RIBAS:

P. Cuando usted estaba allí que usted dijo que la persona que había disparado era un tal Bullín y que ahora me entero se llama; quién le dio a usted ese nombre?

R. Ese era el comentario de la gente.

P. Usted estaba en el Cuartel, ah, y dónde fue usted a declarar eso?

R. A Fiscalía.

P. En algún momento en que usted dice un tal Bullín, en alguna ocasión le llevaron a este acusado para ver si ese era el Bullín?

R. No señor.

NADA MÁS.

HON. JUEZ:

Puede retirarse. Marshal, que permanezca bajo la custodia del alguacil este testigo.

LCDO. ANDRÉU RIBAS:

Con nuestra excepción.

HON. JUEZ:

Anótese.

LCDO. ANDRÉU RIBAS:

Se hace eso a pesar que le he dicho a Su Señoría que en presencia del jurado no indicara nada.

HON. JUEZ:

El Tribunal sabe lo que tiene que hacer y lo hace asumiendo lo que haya que hacer y sabiendo lo que es la ley. Adelante."

El testigo Agustín Luna Roque testificó así:

"P. Usted lo vio ese día a Vicente Ayala Ortiz, allá para el día 30 de setiembre de 1966 como a eso de las 10:30?

R. Sí señor.

P. Lo vio; qué fue lo que sucedió si algo sucedió mientras usted estaba frente a La Cuerda Floja?

R. Yo estaba dentro del negocio.

P. Y qué sucedió?

R. Yo no supe lo que pasó entre ellos dos.

P. Ah?

R. No supe lo que pasó fuera.

P. Usted oyó algo, si es que oyó algo?

R. Yo oí las dos detonaciones nada más.

P. Oiga, cómo le dicen a ese señor Vicente Ayala Ortiz?

R. Bullín.

P. Ese fue el Bullín que usted vió allí esa noche?

R. Sí señor.

P. Después que usted oyó dos detonaciones qué usted hizo, si hizo algo?

R. *Yo salí a ver lo que era.*

P. Y qué vio?

R. *El se había ido ya. Corriendo.*

LCDO. ANDRÉU RIBAS:

Se elimine.

HON. JUEZ:

Qué?

LCDO. ANDRÉU RIBAS:

Se elimine todo eso porque él no lo vió entonces. No puede decir, si lo vió corriendo.

HON. JUEZ:

Usted lo vió corriendo?

R. Sí. Yo lo ví a él pero cuando salí ya él iba corriendo.

Hon. Juez:

Sin lugar la solicitud de la defensa.

Adelante.

Lcdo. Andréu Ribas:

Con nuestra excepción.

Hon. Fiscal:

P. Qué, si algo, notó que llevara en las manos?

Lcdo. Andréu Ribas:

Sugestiva.

Hon. Juez:

Sin lugar.

Lcdo. Andréu Ribas:

Sin lugar esa sugestión, qué llevaba en la mano.

Hon. Juez:

Sin lugar.

Lcdo. Andréu Ribas:

Excepción.

Hon. Juez:

Anótese.

Hon. Fiscal:

P. Qué llevaba?

R. Un revolvito así, niquelado, corto.

P. Este señor que está aquí?

R. Sí.

P. Qué pasó después de eso?

R. Cogimos al herido y lo llevamos al dispensario y del dispensario lo llevamos al Centro Médico."

En contrainterrogatorio testificó así:

"P. Dígame *si usted me dijo* allí [en la vista preliminar] o no me dijo a mí allí, al juez Fortis *que usted estaba borrachísimo dentro de la barra?*

R. Sí señor, lo dije.

P. Estaba o no?

R. *Estaba borracho.*

P. Desde cuándo estaba *bebiendo?*

R. *Desde por la tarde.*

P. A qué hora fueron los tiros?

R. 10:45.

P. También le dijo al juez Fortis que estaba tan borracho que estaba así (hace un gesto) en la barra cuando sonaron los tiros?

R. Yo estaba borracho.

P. Y que *estaba recostado porque no se podía tener en pie*?

R. Sí.

P. Y suenan dos tiros, dos tiros y usted sale a asomarse?

R. Sí señor.

P. Y todavía *cuando usted llega a la puerta y se asoma todavía este señor va corriendo*?

R. *Estaba allí cuando yo salí.* (Énfasis nuestro.)

. . . . . . . .

LCDO. ANDRÉU RIBAS:

P. Si usted *cuando lo llevaron al cuartel que se tuvo que acostar en el banco* porque no se podía estar en pie?

R. Sí señor.

. . . . . . . .

P. Díganos entonces, señor, si usted cuando se emborracha le afecta la vista?

R. No señor.

P. Se queda como si nada?

R. No.

P. Qué le pasa cuando *se siente bien 'jendío'* qué le pasa, ve lo mismo que normal, camina lo más normal?

R. Caminar no.

P. Piensa . . . .

HON. JUEZ:

Un momentito, deje que conteste. *Dice con la vista ve igual, que caminar eso no.*

R. No puedo caminar igual.

LCDO. ANDRÉU RIBAS:

P. Y razona igual?

R. *Razonar igual no puedo.* (Énfasis nuestro.)

. . . . . . . .

LCDO. ANDRÉU RIBAS:

P. A usted lo que le llama la atención son dos disparos mientras usted está recostado de la barra, dentro de la barra todavía,

como es que usted sí puede asegurar a estos señores que él estaba
fuera y que él corrió?

R. Porque yo salí y lo ví, señor.

P. A qué *distancia de usted estaba este señor*?

R. Como treinticinco pies.

P. Y usted me hace el favor de decirme . . .

HON. JUEZ:

De ahí a dónde?

LCDO. ANDRÉU RIBAS:

Si es más.

R. Como de aquí donde está el guardia.

HON. JUEZ:

Alrededor de 35 pies, colega.

LCDO. ANDRÉU RIBAS:

P. De dónde a dónde? El alumbrado cómo era?

R. Semi-oscuro; pero se veía.

P. A las diez y media de la noche?

R. Sí señor.

P. O era oscuro completo?

R. No señor.

P. Usted lo que ve a 35 pies fue un hombre de espaldas?

R. De espaldas.

P. El iba corriendo de frente para usted, o iba de espalda
así, pregunto; iba corriendo en dirección opuesta dándole la
espalda o el frente a usted, vamos a ver?

R. Se supone que tiene que quedar de espaldas para correr.

P. Entonces está en esta posición, usted allá y él así?

R. No señor.

P. Así?

R. Cuando yo salí lo ví de frente.

.        .        .        .        .        .        .        .

HON. JUEZ:

En qué momento es que lo ve de frente, esa es la pregunta que
se le ha hecho, se le ha formulado.

R. Cuando *tenía el revólver en la mano*.

LCDO. ANDRÉU RIBAS:

P. Haciendo qué?

R. Cuando disparó al señor.

P. Si usted no lo vio disparar?

R. Pero oí la detonación y salí.

P. Usted oye las detonaciones y dice que cuando sale a la puerta lo vió que se alejaba corriendo, a 25 pies, sí o no?

R. Yo lo ví al frente y después embaló a correr.

P. Mire señor, vamos a ver, si quedamos en lo que usted declaró al fiscal, usted está dentro de la barra, sí o no?

R. Sí señor.

P. Usted está borrachísimo, sí o no?

R. Sí.

P. No sae [sic] cuántos palos se había dado, sí o no?

R. No señor.

P. Sus movimientos cuando se emborracha no son normales, sí o no?

R. No.

P. Usted oyó dos disparos?

R. Sí señor.

P. Entonces usted que está borrachísimo se empieza a mover y le pregunto desde el momento que usted oyó las detonaciones ya usted sabía que había sido ahí al frente?

R. Seguro.

P. Usted dijo o no dijo que cuando usted se asomó vio al acusado que corría?

R. Lo vi, lo ví, lo ví cuando embaló a correr.

P. Usted está diciendo 'lo ví y lo ví' porque este señor o un fiscal antes que éste le dijo que usted tenía que decir lo que decía en esa declaración o sino estaba preso?

R. Ahí está la declaración que estoy diciendo la verdad?

P. Pregunto eso, *si le dijeron o no que si usted no sostenía eso hoy se quedaba usted preso*?

R. *Sí señor.*

P. Quién se lo dijo?

R. Montalvo.

P. Hoy mismo se lo dijo?

R. Y Fortis.

P. Usted no ha hablado con el compañero, el fiscal este, no habló con él antes de venir aquí?

R. Sí.

P. Qué le dijo este compañero señor Rebollo, fiscal?

R. Que si mentía iba preso.

P. Usted le dijo o no le dijo al Juez Fortis delante de mí

allá que usted había dicho era Bullín en el cuartel porque usted se quería ir y los demás decían era un Bullín?

R. Cómo que yo me quería ir.

HON. JUEZ:

P. Si usted le dijo al juez Fortis que usted decía era Bullín porque quería irse?

R. No señor.

.    .    .    .    .    .    .    .

R. Yo lo ví, señor. Los ojos míos no fallan.

P. Son infalibles aún cuando están borrachos y aún en lugares oscuros?

R. Sí.

P. Y *cómo vestía este señor?*

R. *Eso no.*

P. ¡Fíjese como le fallaron los ojos!

HON. JUEZ:

Vamos a dejar los comentarios.

LCDO. ANDRÉU RIBAS:

P. Usted acaba de decir que sus ojos no fallan, usted ha asegurado que vio este señor, ahora pregunto cómo vestía y me dice que no sabe, eso no lo sabe?

R. No puedo describir la ropa de él.

P. Eso es lo que más se ve de uno.

R. No me fijé en eso.

P. En qué se fijó, en el coco, aquí?

HON. JUEZ:

*Que si se fijó en el coco?*

R. *No.*" (Énfasis nuestro.)

El testigo Juan José Rodríguez testificó que no vio al apelante en el lugar y hora de los disparos en cuestión, que sintió un disparo y se sintió herido y vio una persona de espalda que salió corriendo; que el apelante no había tenido disgusto con el testigo; no oyó al que le disparó; éste no se paró a hablar con el testigo; no puede decir que el apelante se le parece a la persona que corría; que "no se me puede parecer"; al preguntársele que "¿No se le parece?" contestó "No señor; *que el sitio estaba prácticamente oscuro.*

Consideraremos los apuntamientos conjuntamente por estar relacionados entre sí.

Nos confrontamos, esencialmente, con un problema de identificación de la persona que hizo los disparos en este caso. De los cuatro testigos que presentó el fiscal sólo uno, Luna Roque, identificó al apelante como la persona que hizo dos disparos en el lugar y hora de los hechos; que lo vio salir corriendo de allí portando "Un revolvito así, niquelado, corto." No creemos que este testimonio debió merecer el crédito que se le dio. Por el contrario concluimos que si los otros testigos que estaban en el lugar no pudieron identificar al apelante como el que disparó, mucho menos podía hacerlo Luna Roque, quien admitió que estaba borracho, bebiendo desde por la tarde, recostado sobre la barra porque no se podía tener en pie. Aunque testificó que cuando está en esas condiciones no puede caminar normal sostuvo que no se le afecta la vista, que pudo ver al apelante aunque el lugar, según otro testigo, "estaba prácticamente oscuro." No pudo decir cómo vestía el que disparó pues no se fijó en eso. Fue el único que testificó que pudo ver al apelante de frente con el revólver en la mano a pesar de que estaba más alejado que los otros testigos, y además, borracho recostado en la barra, de manera que necesariamente en lo que se levantó y anduvo hasta la puerta, el que disparó tuvo tiempo de volverse de espaldas y echar a correr, movimiento que debió hacer con gran rapidez pues los otros testigos que estaban en las cercanías no acertaron verle de frente y sí cuando ya se alejaba corriendo.

Por otra parte, el primer testigo, quien vio llegar al que disparó y le oyó hablar al que hirió en el estómago, dijo que el que disparó era más alto y más blanco que el apelante, mientras que el herido no lo pudo identificar aunque nunca perdió el conocimiento y lo vio alejarse de espaldas al lugar.

A nuestro juicio, de la prueba aducida surgió duda razonable sobre la identificación del que disparó.

En *Pueblo* v. *Olivencia*, 93 D.P.R. 845 (1967), la situación era completamente distinta. Según el criterio de la mayoría del tribunal, en ese caso no hubo prueba clara y convincente de que el apelante portaba un arma prohibida. En el caso de autos se trata de un problema de identificación de la persona que hizo unos disparos en un cafetín. La prueba, a nuestro juicio, no sólo era insuficiente en cuanto a identificar al apelante como tal persona, sino que más bien tendió a demostrar que otra persona, y no el apelante, fue el que hizo los disparos en cuestión.

*En vista de lo expuesto, se revocarán las sentencias dictadas en este caso por el Tribunal Superior, Sala de San Juan, en 23 de febrero de 1967 y se absuelve al apelante.*

El Juez Presidente Señor Negrón Fernández disintió. El Juez Asociado Señor Torres Rigual emitió opinión disidente en la cual concurren los Jueces Asociados Señores Blanco Lugo y Rigau.

—o—

Opinión disidente del Juez Asociado Señor Torres Rigual en la cual concurren los Jueces Asociados Señores Blanco Lugo y Rigau.

San Juan, Puerto Rico, a 2 de abril de 1969

Disiento. Hemos resuelto centenares de veces que no se debe alterar en apelación la apreciación de los hechos por el juzgador que esté basada en la prueba. Estas decisiones se convierten en vana y hueca retórica cuando dejamos sin efecto, como lo hacemos en este caso, una sentencia condenatoria fundada en la convicción por un jurado, sobre el cual ni siquiera se ha intentado imputar—porque no hay base para ello— pasión, prejuicio o parcialidad.

Cualquiera persona inteligente, y más aún, si tiene un buen entrenamiento legal, puede, si se propone, llegar a la conclusión que desee con un récord escrito. La interpretación

podrá inclusive demostrar una competente capacidad de análisis pero no necesariamente hacer justicia, que es, en última instancia, la misión de este Tribunal.

Sólo tenemos ante nos el récord escrito, sin ninguno de los elementos imponderables que pudieran haber influido en el ánimo del jurado. No conocemos las sutilezas que se manifestaron en la forma de los testigos declarar, en sus ademanes o titubeos. Las múltiples incidencias de un proceso criminal no se reflejan totalmente en el récord escrito. Un juicio es un intenso drama humano, un complejo de afirmaciones y contradicciones de influencias recíprocas, aparentes unas y reales otras, que sólo puede comprenderse a cabalidad cuando se considera la prueba en *todo su conjunto* y no meramente la que aparece en el récord escrito.

Por eso, *insisto* que sólo debemos alterar un veredicto cuando haya ausencia absoluta de prueba, o la misma sea insignificante, o poco satisfactoria por ser intrínsecamente increíble o inherentemente improbable. Aplicada esta norma al caso de autos es inescapable la confirmación de la sentencia.

Todo lo que está envuelto en este caso es si se identificó o no al acusado. La determinación de ese hecho es de la exclusiva incumbencia del jurado. Hubo prueba de la identificación del acusado, según se desprende del resumen de la prueba transcrito en la propia opinión del tribunal. El jurado le dio crédito. No podemos perder de vista que dos testigos del fiscal, por razones que desconocemos, variaron su testimonio. Uno de ellos fue convicto por perjurio. El tercer testigo, Agustín Luna Roque, declaró que vio al acusado con el revólver en la mano mientras corría para alejarse del sitio. Persistió en su testimonio a pesar del fuerte y hábil contrainterrogatorio a que le sometió la defensa. No obstante, la opinión del Tribunal concluye que surgió duda razonable sobre la identificación del acusado. Si surgió o no duda razonable era una cuestión de la exclusiva incumbencia del jurado y no de este Tribunal en apelación. Pocas sentencias condenatorias preva-

lecerían si tan ligeramente revocamos, como lo hacemos en este caso, porque hay una discrepancia sobre duda razonable entre este Tribunal en apelación y el juzgador de instancia.

Merece también un comentario los errores primero y cuarto[1] imputándole al juez de instancia que lesionó el derecho del acusado a un juicio imparcial y justo al hacer ciertas manifestaciones en presencia del jurado.[2] Hemos leído y releído cuidadosamente el récord. Notamos en más de una ocasión el esfuerzo legítimo del juez de esclarecer la verdad. No puede perderse de vista que dos testigos de cargo variaron sorpresivamente sus testimonios, respondiendo repetidamente con evasivas. No hay nada más lesivo al decoro y la dignidad de un tribunal que un testimonio abiertamente perjuro. Ante esa situación, era no sólo legítimo sino indispensable para una buena administración de la justicia, que el juez hiciera un esfuerzo por esclarecer los hechos. Su intervención a esos fines debe ser motivo de encomio y no de censura. El juez

---

[1] La opinión de la mayoría no hace referencia a estos errores porque era innecesario en vista de la conclusión a que llegó.

[2] Se refiere principalmente al siguiente incidente que aparece a la página 31 T.E.:

"HON. JUEZ:—

P.—Ese señor que usted conoce por Bullín es un ser humano, un fantasma, un negro, un blanco?

R.—El nombre.

P.—Ese que conoce por Bullín cómo era, si era un hombre blanco o un hombre de color?

R.—Según yo lo ví en la forma mía era un hombre flaco alto.

HON. JUEZ:—

Adelante fiscal.

HON. JUEZ:—

P.—Usted tiene más de 18 años?

R.—Dieciocho.

P.—Ya cumplidos?

R.—Sí.

HON. JUEZ:—

Me alegro. Marshal tráigame el Código Penal. Adelante.

LCDO. ANDRÉU RIBAS:—

Vamos a pedir se retire el jurado.

HON. JUEZ:—

Como no. Retire el jurado. (Se retira el jurado del salón.)"

tiene la obligación en el ejercicio de su alto ministerio de dirigir los procedimientos con seguridad y firmeza preservando el respeto, la dignidad y el decoro en la administración de la justicia. Es sólo de esa manera que se puede inspirar confianza en la judicatura y preservar su prestigio en la comunidad.