C. BREWER PUERTO RICO, INC., querellada y recurrente, *v.* JUAN RODRÍGUEZ SANABRIA, querellante y recurrido.

*Numero:* R-71-10       *Resuelto:* 26 de septiembre de 1972

*Ramón Cancio,* abogado de la recurrente; *Gutiérrez & Schmer,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Reclamado el pago de $50,675.04 por concepto de horas extras trabajadas como listero y segundo mayordomo en exceso de ocho horas al día, horas trabajadas durante el séptimo día de cada semana, el tiempo de tomar café y el almuerzo, desde enero de 1959 a julio de 1964, más una suma igual en concepto de daños y perjuicios, se alegó como defensa que el recurrido actuaba durante dicho período como uno de los ejecutivos de la recurrente.

Por los fundamentos que exponemos a continuación concluimos que el recurrido al actuar durante ese término como segundo mayordomo de una sección de 600 cuerdas de una finca de caña de la recurrente, ejercía funciones de ejecutivo.

El tribunal de instancia concluyó que durante la época que el recurrido ejerció la faena de listero ". . . la evidencia no es confiable, aparte de que indica que hubo una reclamación por dicho concepto y que hubo un pago."

*Quedó pendiente el período de diciembre de 1959 a 1964 en que el recurrido recibía un sueldo de $42 semanales hasta enero de 1962, de $46 hasta diciembre de 1962, y de $200 mensuales hasta julio de 1964.*

La controversia restante es con respecto a si durante este período el recurrido ejercía funciones y en efecto era un *ejecutivo* de la recurrente.

Concluyó el tribunal a quo, además, que:

"El querellante trabajó como segundo mayordomo en la Colonia Mandry desde el 22 de diciembre de 1960 al 20 de julio del 1964. La evidencia no establece que cuando la querellada contrató al querellante en su nueva actividad se le señalaran por escrito lo que demuestra un patrón de conducta propiciadora de situaciones como la envuelta en este caso. La evidencia demuestra que el mayordomo primero era el funcionario con poder para despedir y suspender obreros para resolver o intervenir en la solución de conflictos entre los obreros de la Colonia y la Unión Obrera. El mayordomo segundo no tenía esos poderes y de

hecho aunque aparece que el mayordomo primero los ejercitó durante el período del 1960 al 1964; el mayordomo segundo, el aquí querellante, nunca los ejercitó. No se ha señalado una sola circunstancia en que la querellada hubiese actuado en alguna de las áreas funcionales señaladas a instancia del aquí querellante. Tampoco aparece que la querellada hubiese, por acto afirmativo alguno, hecho saber a los obreros de la Colonia sobre las facultades ejecutivas del querellante, en paridad de situación y circunstancias con el mayordomo primero. Todos estos elementos factuales y otros que surgen de la evidencia y que no precisa señalar, conducen al Tribunal a sostener que el aquí querellante no era el empleado ejecutivo o administrativo a que se refiere el Reglamento Núm. 13 Revisado de la Junta de Salario Mínimo.

. . . el trabajo del querellante aumentaba de hecho en los períodos de zafra siendo normal en el resto del año. Durante el corte de caña el querellante tenía que levantarse bien temprano para ir a buscar obreros que trabajaban en el corte, desde sus casas al corte y viceversa. Estas personas que se dedicaban a cortar caña vivían cerca o dentro de la Colonia pero él tenía que transportarlos en 'jeep' que le proporcionaba la querellada. Es de notar que el mayordomo primero no aparece que realizara tal faena.

. . . además de las labores que tenía que realizar como mayordomo, segundo de la Colonia, tenía que ir a recoger obreros para el corte de caña en diversos sitios y llevarlos a su casa. Esa labor la realizaba el demandante fuera de las horas y del trabajo normal como mayordomo segundo.

El Tribunal estima que esa labor le tomaba unas 5 horas diarias en exceso a la jornada diaria de 8 horas.

.     .     .     .     .     .     .     .

El Tribunal, como se ha dicho, no tiene evidencia suficientemente confiable para determinar si el querellante trabajó los domingos y cuanto si fue que trabajó.

Como cuestión de hecho, el Tribunal no tiene evidencia confiable en cuanto a que el demandante trabajase durante la hora del almuerzo.

Como cuestión de derecho el demandante no tiene derecho a que se le compense por el llamado 'Coffee Break', si fue que lo trabajó."

A base de tales conclusiones el tribunal dictó sentencia condenando a la querellada a pagar al querellante $4,916 más otra suma igual por daños liquidados más $500 de honorarios de abogado.

Las partes están contestes en que la disposición legal aplicable a esta reclamación es el Reglamento Núm. 13 Revisado de la Junta de Salario Mínimo (29 R.&R.P.R. sec. 246e–8(2)(c). En este Reglamento se define el término *Ejecutivo* como "Cualquier empleado que preste servicios en actividades agrícolas de producción de caña (bien como encargado, capataz, supervisor o mayordomo de una finca cañera) que reuna los requisitos que se especifican en los incisos (1), (2) y (3) del Apartado (C) y que reciba una compensación fija (por día, semana, quincena o períodos mayores) equivalente a un salario semanal no menor de treinta dólares ($30.00)." Los incisos (1), (2) y (3) del Apartado (C) proveían lo siguiente:

"(1) que como encargado, [capataz, supervisor] o mayordomo de una finca tenga a su cargo, total o parcialmente, la supervisión de la misma;

(2) que tenga autoridad para emplear y despedir otros empleados o cuyas sugestiones y recomendaciones sobre el empleo y despido de otros empleados y en cuanto al mejoramiento y ascenso o en relación con cualquier otro cambio de status de otros empleados, hayan de recibir especial atención;

(3) que habitual y regularmente ejerza facultades discrecionales;"

No hay duda que el recurrido cumple con el requisito de salario de ejecutivo, pues siempre ganó en el período en cuestión más de los $30.00 semanales que fijaba dicho Reglamento para esa época.

Dijimos en *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 581, 582 (1961), al revocar una convicción por una infracción a la "Ley de Bolita", que:

"Es norma reiterada nuestra la de respetar y sostener la apreciación que hagan los jueces de instancia de la prueba que ante ellos se ofrece. Solamente hemos alterado esos dictámenes en casos de 'error manifiesto' en el desempeño de dicha función, cuando un examen detenido de toda la prueba nos convence que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables, o increíbles.

. . . . . . . .

". . . Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería."

Así mismo en *Román Montalvo* v. *Delgado Herrera*, 89 D.P.R. 428, 436 (1963), en consonancia con la anterior norma, revocamos una sentencia a favor de un lesionado, en un caso de daños y perjuicios, porque la versión de los hechos creída por el juez de instancia era a todas luces desacreditada. Dijimos en este caso ". . . Es más bien una cuestión de suficiencia de la prueba, de su calidad, que de su apreciación."

En *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56 (1966), una mayoría de este Tribunal revocó una convicción del delito de poseer heroína porque ". . . el contenido de la [prueba] presentada hace surgir una duda razonable sobre la responsabilidad del acusado." Véanse, además, *Pueblo* v. *Ortiz Morales*, 86 D.P.R. 456, 468 (1962); *Pueblo* v. *Ramos*, 43 D.P.R. 71, 73 (1932), en el cual dijimos que: ". . . como tribunal de apelación podemos determinar si hubo un manifiesto error en la apreciación de la prueba. . . ." En los casos de *El Pueblo* v. *Vázquez*, 33 D.P.R. 194 (1924); *El Pueblo* v. *Rivera*, 25 D.P.R. 812 (1917); *El Pueblo* v. *Ortiz*, 22 D.P.R. 677 (1915); *El Pueblo* v. *Cofresí et al.*, 22 D.P.R. 749 (1915); y *El Pueblo* v. *Vega*, 15 D.P.R. 339, 352 (1909), revocamos las convicciones por ser la prueba insuficiente en todos ellos. Véase, además, *Pueblo* v. *Ayala Ortiz*, 97 D.P.R. 168 (1969).

En el caso ante nos, debemos considerar la prueba aducida, a la luz de las normas que acabamos de exponer con el

fin de determinar si el reclamante realizaba su trabajo dentro de los requisitos marcados en el referido reglamento.

La prueba demuestra que el recurrido trabajaba en la colonia Mandry de la querellada la cual estaba a cargo de un mayordomo. Esta finca se componía de dos secciones, cada una bajo un segundo mayordomo. El querellante estaba a cargo de la sección mayor de 600 cuerdas.

De acuerdo con el mayordomo de la colonia Mandry, Sr. Pedro Pérez Nieves, quien al momento de testificar en el juicio celebrado en 24 de febrero de 1970 no trabajaba para la recurrente desde septiembre de 1967, el recurrido, como segundo mayordomo a cargo de la sección de 600 cuerdas de la colonia Mandry, realizaba las siguientes funciones:

1.—Tenía ingerencia en nombrar los 5 ó 6 capataces empleados durante la zafra, cada uno de los cuales tenía de 15 a 20 obreros;

2.—Organizaba y supervisaba el corte de caña, arrimo y el cultivo proveyendo "la gente" necesaria para estos trabajos; "cambiaba los obreros, si no les convenía de un sitio a otro por cualquier razón"; a veces consultaba con el testigo sobre esto; a veces lo hacía por su cuenta;

3.—Escogía, disciplinaba y despedía obreros sin consultar con el mayordomo;

4.—En tiempo muerto organizaba, distribuía el trabajo y "vigilaba por los cultivos de caña, la siembra, el corte de semilla . . . no tenía que consultar conmigo"; y escogía los capataces y los obreros. A esos efectos y durante la zafra usaba un "jeep" de la querellante para moverse de un sitio a otro.

5.—Preparaba un presupuesto semanal de gastos de su sección y lo sometía al testigo, incluía los gastos de recolección y cultivo incluyendo los del mayordomo y del segundo mayordomo. Si el dinero no daba para realizar su trabajo era responsabilidad del recurrido suspenderlo para la otra semana.

6.—Atendía trabajos de emergencia, como reparaciones de puertas y cercas. Para este propósito él buscaba el personal necesario.

7.—Como el recurrido no tenía horario fijo él mismo apuntaba su entrada y salida de su trabajo; trabajaba de 5:30 a.m. hasta las 6:00 p.m. Los obreros corrientes sí tenían hora fija.

8.—Tomaba una hora más o menos para almorzar en su casa, vivienda que le suplía el patrono.

9.—Cuando faltaba al trabajo por enfermedad no se le descontaba. Se le daba dos semanas de vacaciones al año; a los capataces y obreros no.

Testificó dicho mayordomo, además, que él daba vueltas por las secciones "a ver como estaba el asunto de trabajo" y supervisaba los trabajos "y les indicaba la mejor forma de trabajar"; le daba órdenes a los segundos mayordomos y estos "cumplían . . . las órdenes que yo le daba con los capataces"; que él (el recurrido) consultaba con el testigo, "si me encontraba de momento"; que "yo vigilaba el trabajo que él hacía y él vigilaba que el trabajo quedara bien hecho"; que tanto él como el recurrido tomaban tiempo para tomar café a eso de las 8:00 a 9:00 de cada mañana en la residencia de cada uno; no así los obreros; que el testigo y el recurrido se veían 10 ó 12 veces en un día en el campo. Luego dijo que lo veía 4 ó 5 veces diarias en su sección. Veía a los dos segundos mayordomos tomar el café, y el almuerzo porque "tenía yo que pasar por obligación por las casas de ellos todos los días"; que el recurrido daba órdenes a los capataces sobre el trabajo a realizarse; que el testigo fijaba la hora de comenzar y terminar el trabajo; que si el testigo encontraba algo mal hecho les decía "corrijan eso, que está mal hecho"; que "si acaso algún obrero no servía, él [el recurrido] lo mandaba a suspender" pero no recordó el nombre de ningún obrero o capataz así suspendido, debido a los años que habían pasado; que el testigo examinaba los presupuestos que le sometían los

segundos mayordomos, los hacía corregir si encontraba algo mal, los firmaba y los mandaba a la oficina central; mencionó el nombre de los capataces que escogió el recurrido; que al eliminarse los listeros, los capataces hacían unas listas en que anotaban las horas trabajadas por cada obrero cuyo nombre aparecía impreso en las listas, el capataz firmaba estas listas y el mayordomo las recogía y las llevaba a la oficina central; que cuando el testigo y el recurrido estaban en distintos sitios de la sección, cada uno daba órdenes directas con respecto al trabajo en el lugar en que se encontraban; que el recurrido no trabajaba los domingos.

La prueba aducida por el recurrido es tan parcializada, e inherentemente improbable e increíble, que no merece crédito.

El recurrido testificó que su función como segundo mayordomo consistía en "verme con el mayordomo primero, que era el ejecutivo, para coger las órdenes del día y obedecerlas. Estas órdenes incluían, el personal a usarse al otro día y el trabajo a realizarse." Testificó que "las funciones mías eran, yo diría, que mensajero del mayordomo primero", que no podía buscar obreros por su propia cuenta "porque no me atrevía. Si llegaba a hacerlo algún día, !cristiano!", que el mayordomo primero escogía los obreros; que el testigo nunca escogió ni obreros ni capataces; que el mayordomo primero "los mandaba a trabajar y yo atendía cualquier cosa que ellos decidían pero mandado por él"; que "si había que botar a alguien había que hablar con el mayordomo primero"; que entraba al trabajo a las cuatro de la mañana cuando iba "primero a recoger la gente". En un *jeep*, asignado para el trabajo . . ."; que los nombres de estos obreros se los daba el mayordomo; que luego daba vueltas por los callejones "supervisando el cultivo, quiere decir, viendo si hacía falta algo del cultivo para notificar allá al mayordomo. . . ."; que buscaba el desayuno de los obreros del arrimo y de la grúa a las tiendas cercanas y se los llevaba "A la pieza de caña a dárselos a los

obreros"; que pedía órdenes del mayordomo de usar el zancú o no usarlo"; que él pasaba las órdenes que daba el mayordomo; que "Después del desayuno tenía que ir a buscar los almuerzos . . . a las 10:00 y media. A los distintos sitios"; que a esos fines daba 3 ó 4 viajes; que, además, por órdenes de los jefes grandes iba "a buscar agua en un cubo en el mismo 'jeep'. . . . Para los obreros"; que a "los obreros que traía por la mañana tenía que llevarlos donde los cogió . . . y traía los nuevos para el 2do. turno"; que a las 10 de la noche llevaba a los obreros "a su propia casa donde los cogí por la tarde . . . durante la zafra" de manera que el testigo regresaba a su casa regularmente de 11 a doce de la noche y se levantaba a las 4 y media de la madrugada para comenzar el trabajo del día siguiente; que no le daban vacaciones; que trabajaba 7 días a la semana pues el domingo preparaba "las nóminas" que en la Central aparecían firmadas por él; que no tomaba el *coffee break* pues "Eso yo no lo conocía; no había tiempo para eso"; que durante la zafra ". . . en 10 minutos tenía que almorzar y seguir andando"; que "el mayordomo era el 'all around'; en otras palabras era el más que manda"; que su trabajo en la preparación del presupuesto consistía en pasar al presupuesto que "era un libro más grande" las notas en papel cualquiera que le daba el mayordomo "porque el mayordomo era el que mandaba a hacer todo. . . . A base de los números que él llevaba en su libreta . . ."; que si se despidió algún capataz lo hizo el mayordomo; que el que llamaba la atención por algún asunto del trabajo era el mayordomo; que "A fines del 1962 y a principios del 1963 eliminaron los listeros entonces, nos dieron órdenes que éramos mayordomos 2do., para buscar la gente, y hacer las listas, y hacer los 'payrolls', y hacer todo lo que hacía el listero"; que las nóminas se preparaban en máquinas IBM; que de los apuntes de los capataces en sus libretas, el testigo pasaba los datos a unas listas grandes a manuscrito y éstas se pasaban a la oficina. Preguntado si en unas listas impresas no venían los nombres

de los obreros y si faltaba alguno se tachaba, y si había uno nuevo se agregaba a la lista, contestó: "!caramba!, yo le voy a ser sincero: no sé si la lista venía, lo cierto es que nosotros teníamos que ver con el asunto ese . . . de eso no recuerdo." No recordaba si esas listas existían, si se recogían todos los días; que "si la había era semanalmente que la recogíamos."

El delegado de la Unión y operador de un vehículo de arrastre conocido como "Zancú" en la colonia Mandry, testificó que el recurrido trabajaba allí como empleado; que el mayordomo Pedro Pérez supervisaba el trabajo del testigo, nunca el recurrido; que veía al recurrido en un *jeep*; "Unas veces llevaba gente, otras veces llevaba almuerzos, otras veces pasaba vacío el 'jeep' "; que cuando trataba de comunicarse con el recurrido o cuando se rompía el "zancú" ". . . lo buscaba a él [Pedro Pérez] porque él [el recurrido] me decía que él [Pérez] era el mayordomo allí . . . con quien yo tenía que hablar algo allí, fuera de las funciones de la Unión o fuera de las funciones . . . del trabajo, era con él [Pérez]"; que quien le impuso un castigo de suspensión por una semana fue Pérez quien supervisaba el corte y arrimo en la colonia Mandry; que cuando suspendían trabajadores, el testigo, como delegado de la Unión, primero trataba el asunto "con el capataz que había, que tiene que ver con esa función, y después, si no podíamos resolver entre el capataz y yo el problema . . . entonces buscaba a don Pedro Pérez . . ."; que el recurrido le decía que "no tenía mando para bregar con esas cosas"; que suponía que el recurrido era ayudante de Pérez; que no sabía que había un segundo mayordomo; que el recurrido lo vio "Lo veía por todo aquello . . . lo encontré en dos o tres ocasiones por allí . . . hablaba con los trabajadores y los capataces . . . yo no atendía lo que ellos hablaban . . . creía primero que él podría ser un empleado que podría ayudarme en algo . . . porque lo ví caminando en el 'jeep' por allí"; que no sabía que el recurrido era 2do. mayordomo, ni que vivía en casa del patrono aunque sabía que vivía en terrenos de éste.

Flor Díaz Medina, encargado de la estación de ferrocarril del patrono, en Naguabo, testificó que conoció al recurrido cuando éste fue a trabajar de listero o mensajero . . . en la colonia Mandry . . .''; que lo veía "repartiendo gente" por la mañana y luego por la tarde y "repartiendo almuerzos . . . . Llevando obreros a sus casas . . . durante . . . la zafra . . ., que usaba el 'jeep' para transportar a los obreros, llevarlos a sus casas"; que el recurrido "era un listero; yo diría un mensajero, porque él lo que hacía era llevar papelería y cargar gente"; que el propio recurrido y Pedro Pérez le dijeron que el recurrido era listero por lo que no podía dar permisos ni ·tomar medidas para nada pues eso le correspondía al mayordomo Pedro Pérez; que "Porque yo lo que veía a ese señor [el recurrido] era bregando con sacos y bregando con gente y por eso es que yo digo que era un mensajero de la compañía."

En refutación volvió a declarar el mayordomo Pedro Pérez Nieves para explicar cómo se transportaban los obreros, los almuerzos y el agua en la Colonia Mandry. Testificó que "habían específicamente, trucks para buscar los obreros; si faltaba algún obrero, él [el recurrido] los traía en su carro . . . en el 'jeep' . . . . Estaba Diego Molina que era el chófer que traía la gente del arrimo . . .''; que había un truck para·el arrimo y dos más conducidos por Luciano Lozada· y Faustino Serrano; que "Si le faltaba algún obrero él [el recurrido] cogía del cultivo algún obrero diestro . . . ·si había algún obrero del camino lo llevaba. En cada brigada había almuercero" y un aguadante; que "El mismo que traía el del arrimo traía el de la grúa"; que el patrono pagaba $20 diarios a Diego Molina por llevar y traer los obreros, y $19 diarios a Lozada y lo mismo a Serrano; que "se le pagaba un jornal completo a un hombre por eso, por traer los almuerzos" y un aguadante por llevar el agua; que había un almuercero para el corte y otro para el arrimo quien iba a buscar el almuerzo; que había "venteros" a quienes el patrono permitía

entrar a vender "Cafés, refrescos y frituras y lo que quisieran". Negó haber dicho que él era el que mandaba en la colonia Mandry y que el recurrido no mandaba nada allí pues "él [el recurrido] tenía muchas atribuciones para mandar, y supervisar, y mandar allí." En contrainterrogatorio explicó que la colonia empleaba un promedio de 150 a 200 hombres; que los tres camiones transportaban 40 hombres cada uno más 25 ó 30 vivían "por allí cerquita, por allí en el batey"; que el recurrido "estaba autorizado que si necesitaba obreros buscarlos . . . . No estaba autorizado a buscar almuerzos."

■ El anterior resumen de la prueba, demuestra que las conclusiones del juez sentenciador relacionadas con las funciones del recurrido no están justificadas pues se apoya en testimonios inherentemente increíbles. Por el contrario, la prueba claramente demuestra que:

(a) El recurrido tenía a su cargo la supervisión parcial de una sección de 600 cuerdas de una finca de caña.

(b) Estaba autorizado para emplear, disciplinar y despedir los obreros.

(c) Organizaba y supervisaba el corte, arrimo y cultivo de la caña. A esos efectos tenía ingerencia en nombrar los capataces, proveía los obreros para cada faena, trasladaba a los trabajadores de una faena a otra según las necesidades y preparaba el presupuesto semanal. Como atribuciones de ejecutivo del patrono, no tenía horas fijas de trabajo, vivía una casa del patrono y tenía derecho a vacaciones, privilegios no extendidos a los obreros. *Marcano Rodríguez* v. *Pepsi Cola Bot. Co.*, 95 D.P.R. 445 (1967).

La falta de credibilidad de la prueba del recurrido surge de la exageración con que se trató de aminorar la naturaleza de las funciones del recurrido. El testimonio de que sólo era un listero no es creíble ya que durante el período de la reclamación el patrono había abolido ese cargo y en la oficina central se realizaba el trabajo de nóminas a base de unas listas que llenaban los capataces, entregaban al recurrido y

éste llevaba a dicha oficina. Lo mismo ocurre con el testimonio de que era un mero mensajero para llevar y traer obreros y los almuerzos pues esto no se podía hacer en sólo un *jeep* cuando se trataba de 150 obreros. Resulta obvio que estas funciones tenían que realizarla otras personas usando camiones grandes, personas a quienes el testigo Pérez Nieves hizo referencia específica por sus nombres.

También es de notarse que el testimonio de Pérez Nieves, quien había dejado de trabajar hacía unos tres años para el patrono recurrente antes de testificar podría considerarse más confiable que el del propio recurrido, el representante de la unión y el otro compañero de trabajo, quienes inexplicablemente dijeron no conocer con certeza qué funciones realizaba el recurrido fuera de actuar como listero y mensajero, funciones que claramente no ejercía excepto en cuanto a llevar las listas preparadas por los capataces a la oficina central.

Por los fundamentos expuestos, *debe revocarse la sentencia dictada en este caso por el Tribunal Superior, Sala de Caguas, y dictarse otra en su lugar desestimando la querella.*

El Juez Asociado Señor Hernández Matos no intervino.

El Juez Asociado Señor Dávila emitió opinión disidente en la cual concurren los Jueces Asociados Señores Torres Rigual y Martín.

—O—

Opinión disidente emitida por el Juez Asociado Señor Dávila en la cual concurren los Jueces Asociados Señores Torres Rigual y Martín.

San Juan, Puerto Rico, a 26 de septiembre de 1972

El Tribunal mediante la opinión emitida en el día de hoy deja sin efecto una sentencia del Tribunal Superior, Sala de Caguas que condena a la recurrente C. Brewer Puerto Rico, Inc., a pagar a un obrero la cantidad de $4,916.00 más una suma igual como penalidad y $500 de honorarios de abogado. Disiento porque la Regla 43.1 de las de Procedimiento Civil

de 1958 es clara y terminante al disponer que ". . . [l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos. . . ." La opinión del Tribunal ignora la disposición de la Regla que el propio Tribunal adoptó, y aprecia la prueba como si estuviera juzgando el caso en primera instancia. La función primordial de este Tribunal es determinar si las determinaciones del tribunal de instancia tienen apoyo suficiente en la prueba presentada, y en ausencia de pasión, prejuicio o parcialidad deben ser aceptadas. Es evidente que las determinaciones de hecho que ahora se dejan sin efecto tienen base suficiente en la prueba. No puedo concurrir.