ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **LUIS O. CRUZ RAMOS**<br><br>Apelante<br><br>v.<br><br>**H.J. GAS STATION**<br><br>Apelado | KLAN202300954 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de **Utuado**<br><br>Civil Núm.:<br>**UT2018CV00273**<br><br>Sobre:<br>Despido Injustificado (Ley 80-1976) y otros |

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Rivera Pérez y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de septiembre de 2024.

Comparece ante nos, mediante *Apelación,* el señor Luis O. Cruz Ramos (Sr. Cruz o Apelante) y nos solicita que revoquemos la *Sentencia* emitida el 14 de octubre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Utuado (TPI).[1] Mediante la *Sentencia,* el TPI declaró No Ha Lugar a la *Querella*[2] presentada en contra de H.J. Gas Station (HJ Gas Station o Apelado) por un alegado despido injustificado.

Por las razones que discutiremos en adelante, confirmamos la *Sentencia* del TPI.

**I.**

Según la prueba presentada en juicio y creída por el TPI, desde el 17 de septiembre 2012 hasta el 26 de diciembre 2017, el Sr. Cruz trabajó en HJ Gas Station, una corporación dueña de dos puestos

---

[1] Apéndice de *Apelación*, Anejo I, págs. 1-35. Notificada y archivada en autos el 16 de octubre de 2023.
[2] *Íd*., Anejo III, págs. 37-40.

de gasolina localizados ambos en el municipio de Adjuntas, HJ y DJ. HJ ofrecía servicios de estación de gasolina "*full-service*" y de mercadito ("*mini-market*"). DJ ofrecía servicios de gasolina "*self-service*" y de mercadito ("*mini-market*"). Durante ese tiempo, el Sr. Cruz trabajó como cajero, despachador de gasolina y acomodador de mercancía. Devengó un salario a razón de $7.25 por hora, gozaba de beneficios como licencias por vacaciones y enfermedad, Bono de Navidad, una cuenta de $100.00 para gasolina y mercancía del mercadito, pavo de Acción de Gracias y una regalía anual por las ejecutorias en la empresa.

Entre el 2012 al 2015, el Sr. Cruz fue asignado a los siguientes horarios: miércoles- 6:00pm a 10:30pm; jueves- 6:00pm a 10:30pm; viernes- 6:00pm a 11:00pm; sábado- 2:00pm a 10:00pm; y, domingo- 2:00pm a 10:00pm. A partir de febrero 2015 hasta su renuncia el 26 de diciembre de 2017, el Sr. Cruz tenía como horario de trabajo: igual los miércoles, jueves y domingos; los viernes- 3:00pm a 11:00pm; y, los sábados- 2:00pm a 11:00pm. En agosto de 2015, también se implementó un sistema de depósitos, mediante el cual se depositaban cantidades de dinero a lo largo de su turno, para minimizar la suma de dinero en la caja al momento del cuadre.

El 14 de octubre de 2015, el Sr. Cruz solicitó una *Orden de Protección* en contra de Isael Guzmán, compañero de turno.[3] Según la *Orden de Protección*, Isael Guzmán mostró una conducta agresiva e intimidante en contra del Sr. Cruz, consistente en insultos, gritos y golpes dirigidos a su vehículo.[4] La *Orden de Protección*, expedida el 28 de octubre de 2015, tuvo vigencia hasta el 21 de enero de 2016. El Sr. Cruz le presentó copia de la *Orden de Protección* a HJ Gas Station, por lo que la empresa separó los turnos de trabajo del Sr. Cruz y de Isael Guzmán para que no coincidieran. Esa misma

---

[3] *Íd.*, Anejo XI, págs. 107-122.
[4] *Íd.*, pág. 108.

semana, el Sr. Cruz completó su jornada laboral correspondiente que consistió en 32.75 horas trabajadas y 35.50 horas pagadas.

Durante las dos (2) semanas siguientes a la entrega de la *Orden de Protección,* HJ Gas Station modificó las horas de trabajo del Sr. Cruz temporeramente. Por lo tanto, para la semana de 25 de octubre de 2015, el Sr. Cruz trabajó 18.5 horas, aunque fue compensado como si hubiese trabajado 28 horas, y para la semana de 1 de noviembre de 2015, trabajó 18.5 horas pero fue compensado como si hubiese trabajado 26.5 horas. A partir del 8 de noviembre de 2015, el Sr. Cruz vio un aumento en sus horas asignadas, por lo que trabajó un promedio de 28 horas por semana. El 9 de noviembre de 2015, el Sr. Cruz solicitó el desistimiento voluntario de la *Orden de Protección,* que cobró efecto el 17 de noviembre tras una resolución por parte del Tribunal Municipal de Adjuntas. Tras haber retirado la *Orden de Protección,* el Sr. Cruz añadió un turno adicional en DJ como acomodador de mercancía, así aumentando su horario semanal a 31.5 horas. Para el 2015, el Sr. Cruz devengó $13,076.74.

En el 2016, el Sr. Cruz completó un promedio semanal de 30.74 horas trabajadas y 36.83 horas pagadas. Además, le ofreció tutorías de matemáticas a razón de $10.00 por hora al hijo de su supervisora, Jomary Arroyo, y otras personas en el municipio de Jayuya. Para ese año, el Sr. Cruz devengó $13,708.93.

El 31 de marzo de 2017, HJ Gas Station le informó al Sr. Cruz que le iba a modificar su horario semanal, eliminando su horario los jueves en DJ. Así las cosas, el promedio semanal del Sr. Cruz, hasta el paso del Huracán María, ocurrido el 20 de septiembre de 2017, fue de 24.13 horas trabajadas y 29.39 horas pagadas. Debido al paso del Huracán María, las operaciones de HJ Gas Station quedaron afectadas. En primer lugar, el turno de la noche quedó interrumpido debido al toque de queda decretado a consecuencia del paso del Huracán María. Además, el municipio de Adjuntas

reservó la estación de gasolina de DJ para el uso exclusivo de la flota municipal. Debido a la falta de energía, el sistema electrónico de ponches fue sustituido por hojas de asistencia. Las instrucciones generales de HJ Gas Station a sus empleados fue que su personal trabajara en el horario regular, pero que aquellos empleados que tuvieran acceso cercano a la gasolinera HJ, podían ir voluntariamente a trabajar en cualquier horario que estuvieran disponibles, así como tomar del mercadito cualquier mercancía que desearan, siempre y cuando lo anotaran en el sistema. Por lo tanto, el Sr. Cruz no tenía limitaciones o restricciones impuestas por parte de HJ Gas Station para trabajar en aquellos horarios que tuviere disponible. Dichas instrucciones se mantuvieron en vigor hasta el 24 de diciembre de 2017, cuando cesó la necesidad de ayuda adicional y volvieron a la normalidad las operaciones en ambas gasolineras.

Durante el periodo anteriormente señalado, del 20 de septiembre al 24 de diciembre de 2017, el Sr. Cruz completó un promedio de 21.58 horas trabajadas y 23.41 horas pagadas. Para el 2017, devengó un salario total de $11,093.49. Por su parte, el Sr. Cruz sufrió daños por causa del paso de Huracán María. Ante su necesidad de costear las reparaciones necesarias y mitigar los daños sufridos, solicitó un empleo a tiempo parcial en Baxter, que no le interfiriera con su jornada laboral en HJ Gas Station. Sin embargo, HJ Gas Station se opuso. Así las cosas, el 26 de diciembre de 2017, el Sr. Cruz presentó ante HJ Gas Station una *Carta de Renuncia* voluntaria, en la que no se desprende que el Apelado haya solicitado su renuncia.[5]

Ante esto, el 8 de enero de 2023, el Sr. Cruz presentó una querella ante el Departamento de Trabajo y Recursos Humanos

---

[5] *Íd.*, Anejo XVI, pág. 286.

(DTRH), en la que alegó que HJ Gas Station le debía una compensación por horas extras no facturadas. Esto pues, según el Sr. Cruz, HJ Gas Station le obligaba a atender clientes durante su periodo de tomar alimentos. Las horas que se reclamaban eran del periodo de 2012 a 2015. Así las cosas, el DTRH le ordenó a HJ Gas Station a compensar al Sr. Cruz por el periodo aprobado.

Los hechos antes discutidos surgen de las determinaciones de hechos no controvertidos realizadas por el TPI en su *Sentencia* de 14 de octubre de 2023. Los mismos se plasman a continuación:[6]

1. La Parte Querellante trabajó como empleado de la Parte Querellada desde septiembre de 2012 hasta diciembre de 2017.

2. La Parte Querellada era propietaria de dos gasolineras: HJ Gas Station y DJ Gas Station.

3. Ambas gasolineras están localizadas en el Municipio de Adjuntas.

4. La organización comercial de HJ Gas Station era un DBA, cuya fecha de inicio fue en marzo de 2002.
5. Desde su inicio hasta la pandemia de Covid-19, HJ Gas Station ofrecía servicios de estación de gasolina ("full-service") y "Mini-Market".

6. A partir de la Pandemia de Covid-19, HJ Gas Station modificó sus operaciones de estación de gasolina al método "self-service".

7. La plantilla de HJ Gas Station estaba compuesta por diez (10) o nueve (9) empleados y luego de la pandemia de Covid-19 se redujo de nueve (9) a ocho (8) empleados.

8. La organización comercial de DJ Gas Station es una corporación registrada como "DJ Gas Station and Mini-Market, Corp." desde marzo de 2015.

9. Los servicios ofrecidos en DJ Gas Station consistían en estación de gasolina "self-service" y "Mini-Market".

10. La plantilla de DJ Gas Station estaba compuesta por nueve (9) a ocho (8) empleados.

11. Ambas estaciones de gasolina operaban con el logo de Gulf.

12. Ninguna de las gasolineras cuenta con un puesto de gerente ni supervisor.

---

[6] *Íd.*, Anejo I, págs. 12-18.

13. Los horarios operacionales de HJ Gas Station eran de lunes a jueves (5:00am-10:00pm), viernes y sábado (5:00am-11:00pm) y domingo (6:00am-10:00pm).

14. Los horarios operacionales de DJ Gas Station eran de lunes a jueves (5:00am-10:00pm), viernes (5:00am-11:00pm), sábado (6:00am-11:00pm) y domingo (6:00am-10:00pm).

15. La Parte Querellante trabajaba en la corporación de la Parte Querellada como cajero, despachador de gasolina y acomodador de mercancía.

16. Durante el periodo que trabajó para la Parte Querellada, no hubo quejas sobre el desempeño de la Parte Querellante en sus funciones, nunca fue amonestado e incluso sus ejecutorias beneficiaron a la compañía.

17. La Parte Querellante devengaba un salario a razón de $7.25 por hora.

18. Los empleados de la Parte Querellada, incluyendo a la Parte Querellante, disfrutaban de licencias por vacaciones y enfermedad, Bono de Navidad, y otros beneficios tales como una cuenta valorada en $100 para gastos de gasolina y artículos del Mini-Market, el pavo de Acción de Gracias y una regalía anual por las ejecutorias en la empresa.

19. Los horarios de trabajo que se le asignaron a la Parte Querellante durante los años 2012 hasta febrero de 2015 fueron los siguientes: Miércoles- 6:00pm a10:30pm, Jueves-6:00pm a 10:30pm, Viernes-6:00pm a 11:00pm, Sábado- 2:00pm a 10:00pm Domingo-2:00pm a 10:00pm.

20. El horario de salida podía variar debido a la presencia de clientes en el establecimiento.

21. El horario podía fluctuar debido a la ausencia de algún empleado o extenderse por la celebración de fiestas patronales.

22. El horario de salida tampoco incluía el proceso de cierre y cuadre de caja.

23. A partir de febrero de 2015, el horario de trabajo de la Parte Querellante fue modificado con respecto a los viernes (3:00pm a 11:00pm) y los sábados (2:00pm-11:00pm).

24. En agosto de 2015 se implementó un sistema de depósito que consistía en que el empleado depositaba cantidades de dinero a lo largo de su turno para minimizar la suma de dinero en caja al momento del cuadre.

25. El sistema de depósito que se utilizaba era "Artisoft".

26. El 14 octubre de 2015 la Parte Querellante solicitó una orden de protección al amparo de la Ley contra el Acecho, Ley 284-1999.

27. Surge de la petición de dicha orden que la solicitud de la Parte Querellante fue motivada por un incidente con Isael Guzmán, quien era un compañero de turno que mostró una conducta agresiva e intimidante hacia la Parte Querellante.

28. El incidente inició en el establecimiento de la gasolinera HJ Gas y continuó en el estacionamiento ubicado frente a dicha gasolinera así como también de camino a la residencia de los progenitores de la Parte Querellante en la Urbanización La Monserrate en el municipio de Jayuya.

29. La conducta de Isael Guzmán consistió en insultos, gritos y golpes dirigidos al vehículo de la Parte Querellante.

30. La orden de protección fue emitida por el Tribunal Municipal de Adjuntas y tuvo una vigencia del 28 de octubre de 2015 al 21 de enero de 2016.

31. Posteriormente, el 15 de octubre de 2015, Jomary Arroyo se reunió con la Parte Querellante en la oficina de DJ Gas.

32. La Parte Querellante le entregó a la Parte Querellada una copia de la orden de protección y le explicó su versión de los hechos acontecidos con Isael Guzmán.

33. Luego de la entrega de la copia de la orden de protección, la Parte Querellante completó su jornada laboral para dicha semana que consistió en 32.75 horas trabajadas y 35.50 horas pagadas.

34. Como medida de seguridad, la Parte Querellada separó a la Parte Querellante e Isael Guzmán para que no coincidieran en el mismo turno.

35. A partir de la vigencia de la orden de protección, la Parte Querellada modificó temporeramente el horario de jornada laboral correspondientes a las dos (2) semanas siguientes.

36. Dicha modificación consistió en que la Parte Querellante trabajó los sábados y domingos.

37. Aunque la Parte Querellante trabajó un total de 18.5 horas durante la semana del 25 de octubre de 2015, se le pagó a la Parte Querellante como si la jornada laboral hubiese consistido en 28 horas por semana.

38. De manera similar, la Parte Querellante trabajó un total de 18.5 horas durante la semana del 1 de noviembre de 2015, pero se le pagó como si fuese una jornada de 26.5 horas.

39. Surge de la prueba documental que a partir de la semana 43 correspondiente al 8 de noviembre de 2015, la Parte Querellante trabajó los viernes, sábados y domingos.

40. A partir de dicha modificación en la jornada laboral, el horario de la Parte Querellante aumentó de 18.5 horas a 28 horas promedio por semana.

41. El 9 de noviembre de 2015 la Parte Querellante peticionó su desistimiento de la orden de protección expedida a su favor.

42. Según se hizo constar en la Resolución emitida el 17 de noviembre de 2015 por el Tribunal Municipal de Adjuntas, la Parte Querellante retiró voluntariamente y con conocimiento la orden de protección de manera que se refirió el asunto al proceso de mediación.

43. La Parte Querellada celebró una fiesta de navidad con todo su personal a la cual asistieron la Parte Querellante y su compañero agresor Isael Guzmán dado que la orden de protección no estaba vigente en ese entonces.

44. El proceso de mediación concluyó el 21 de enero de 2016.

45. Tras haber retirado la orden de protección, la Parte Querellada añadió el jueves por 3.5 horas a la jornada laboral de la Parte Querellante para que ejerciera funciones como acomodador de mercancía en DJ Gas a partir del 6 de diciembre de 2015.

46. En 2015 la Parte Querellante completó un promedio de 31.69 horas trabajadas y 46.68 horas pagadas.

47. Según el Comprobante de Retención del año 2015, el sueldo devengando por la Parte Querellante se calculó en $13,076.74.

48. En 2016 la Parte Querellante completó un promedio de 30.74 de horas trabajadas y 36.83 horas pagadas.

49. En el curso escolar de 2016-2017, la Parte Querellante le ofreció tutorías de matemáticas a razón de $10 por hora al hijo de Jomary Arroyo en periodo de exámenes o asignaciones especiales. También ofreció sus servicios de tutorías a otras personas en el pueblo de Jayuya.

50. Según el Comprobante de Retención del año 2016, el sueldo devengado por la Parte Querellante se calculó en $13,708.93.

51. El 31 de marzo de 2017 la Parte Querellada le informó a la Parte Querellante que a partir de abril de 2017 se eliminaba su horario del jueves.

52. Esta fue la última modificación de horario que la Parte Querellada hizo a la jornada laboral de la Parte Querellante hasta su renuncia.

53. En 2017, antes del paso del huracán María, la Parte Querellante completó un promedio de 24.13 horas trabajadas y 29.39 horas pagadas.

54. El Huracán María ocurrió el 20 de septiembre de 2017.

55. Las operaciones de HJ Gas y DJ Gas en el turno de la noche quedaron interrumpidas debido al toque de queda decretado a consecuencia del paso del Huracán María.

56. El Municipio de Adjuntas reservó la estación de gasolina de DJ Gas Station para su flota municipal hasta aproximadamente octubre de 2017.

57. Debido a la falta de energía eléctrica, los ponches se registraban por hojas de asistencia.

58. En noviembre de 2017 la Parte Querellada adquirió un sistema de Internet y eso permitió que ingresara los datos correspondientes al ADP.

59. Las instrucciones generales de la Parte Querellada consistieron en que su personal trabajara en horario regular, pero además aquellas personas empleadas que tuvieran acceso cercano a la gasolinera HJ Gas Station podían venir voluntariamente a trabajar en cualquier otro horario que estuvieran disponibles y tomar los artículos que desearan de la tienda de la gasolinera luego de anotarlos en el sistema correspondiente.

60. La Parte Querellante no tenía limitaciones o restricciones impuestas por la Parte Querellada para trabajar en aquellos horarios que estuviese disponible de la misma manera que el resto de los empleados.

61. Dichas instrucciones se mantuvieron en vigor hasta el 24 de diciembre de 2017 cuando cesó la necesidad de ayuda adicional y las operaciones del negocio volvieron a la normalidad en ambas gasolineras.

62. El método de pago de salario durante el periodo de las ocho (8) semanas posteriores al Huracán María se hizo en dinero en efectivo.

63. Aunque el horario de la jornada laboral de la Parte Querellante se modificó tras el paso del Huracán María, mantuvo el horario de viernes, sábado y domingo.

64. Con posterioridad al paso del huracán María hasta la terminación de su empleo, la Parte Querellante trabajó 21.58 horas en dicho periodo y se le pagó 23.41 en horas promedio.

65. Según el Comprobante de Retención del año 2017, el sueldo devengado por la Parte Querellante se calculó en $11,093.49.

66. El paso del Huracán María ocasionó daños en la propiedad donde la Parte Querellante habitaba junto a su familia.

67. Los progenitores de la Parte Querellante figuraban como titulares de dicha propiedad por lo que la Parte Querellante no cualificó para las ayudas económicas de FEMA.

68. La Parte Querellante sufrió pérdidas materiales que incluyeron el desprendimiento del techo de su hogar y sus pertenencias.

69. La Parte Querellante se acogió al Programa de Asistencia Nutricional provisto por el Gobierno.

70. Los progenitores de la Parte Querellante sufragaban las facturas de los servicios de energía eléctrica y agua mientras que sus suegros asumieron los gastos de vestimenta de los hijos de la Parte Querellante.

71. La Parte Querellante solicitó un empleo a tiempo parcial en Baxter que no interfería con su jornada laboral en HJ Gas.

72. La Parte Querellada tuvo conocimiento de dicha solicitud y le manifestó su desacuerdo a la Parte Querellante.

73. El 26 de diciembre de 2017 la Parte Querellante renunció a su empleo en HJ Gas.

74. El formato de la carta de renuncia se hizo mediante un modelo obtenido de Internet, parafraseando su contenido para adaptarlo al contexto de la renuncia de la Parte Querellante y plasmar su firma en el documento.

75. Dicha carta no contiene ninguna expresión de que la Parte Querellada hubiese solicitado la renuncia de la Parte Querellante.

76. El 28 de diciembre de 2017 la Parte Querellada se comunicó por escrito con la Parte Querellante y le envío su cheque de liquidación de $210.25 por concepto de vacaciones acumuladas y balance de la cuenta pendiente.

77. Al renunciar a su empleo, la Parte Querellante se privó de su sueldo principal con el cual le brindaba el sustento a su familia y pagaba su automóvil, así como también los préstamos estudiantiles y de la cooperativa.

78. El 8 de enero de 2018 la Parte Querellante presentó una querella ante el Departamento del Trabajo y Recursos Humanos por concepto del periodo de tomar alimentos ya que la Parte Querellada le negó dicho periodo, ocasionando que la Parte Querellante tuviera que comer mientras atendía a sus clientes.

79. Las horas extra que la Parte Querellante reclamaba eran consistentes en el periodo desde 2012 al 2015, es decir, desde antes que la Parte Querellada interviniera en el incidente entre la Parte Querellante e Isael Guzmán.

80. Debido al cumplimiento del término prescriptivo, el Departamento del Trabajo y Recursos Humanos atendió la reclamación del periodo de tomar alimentos a partir de los últimos tres (3) años de empleo de la Parte Querellante.

81. Como resultado de dicha querella, el 9 de octubre de 2018, el Departamento del Trabajo y Recursos Humanos le ordenó a la Parte Querellada que compensara la Parte Querellante por el periodo de tomar alimentos mediante el pago de $1,219.93.

82. En cumplimiento con lo anterior, el 19 de octubre de 2018, la Parte Querellada emitió un cheque por la suma de $1,122.94 a favor de la Parte Querellante.

Así las cosas, el 7 de diciembre de 2018, el Sr. Cruz presentó una *Querella* en contra de HJ Gas Station, mediante el proceso sumario que dispone la Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA seq. 3118 *et seq.* (Ley Núm. 2), por represalias (Ley Núm. 115-1991, 29 LPRA sec. 194 *et seq.* (Ley Núm. 115)), discrimen (Ley Núm. 100 del 30 de junio de 1959, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100)) y despido injustificado (Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA sec. 185 *et seq.* (Ley Núm. 80)).[7] Arguyó que a causa de la *Orden de Protección* en contra de Isael Guzmán, HJ Gas Station tomó represalias en su contra. Dicha represalia se constituyó en una reducción de horas y cambio de las condiciones de su entorno laboral. También alegó que se le debían horas trabajadas pero no compensadas.

El 3 de enero de 2019, HJ Gas Station presentó su oposición.[8] En particular, señaló que no hubo un despido injustificado, puesto que el Sr. Cruz renunció voluntariamente, por medio de una carta entregada el 26 de diciembre de 2017. Además, alegó que las

---

[7] *Íd.*, Anejos III y IV, págs. 37-44.
[8] *Íd.*, Anejos VI y VII, págs. 47-60.

reducciones en las jornadas fueron debido a la falta de energía eléctrica y otros factores atribuibles al paso de Huracán María.

Tras varios trámites procesales, incluyendo la celebración de vistas el 7 y 28 de marzo de 2022, 30 y 31 de agosto de 2022, 1 de septiembre de 2022, 5,6 y 7 de diciembre de 2022, 26, 27, 28 y 29 de junio de 2023, 7 de septiembre de 2023 y 3 de octubre de 2023, el 14 de octubre de 2023, el TPI dictó la *Sentencia* de la cual se recurre. En esta, resolvió que según los hechos alegados y la prueba desfilada y creída, no se constituyó un despido injustificado en contra del Sr. Cruz. Por otro lado, en cuanto a la alegación de horas debidas, el TPI concluyó que eso fue lo resuelto por el DTRH, constituyendo aquello cosa juzgada, lo que impide que las partes litiguen el asunto ante el foro judicial.

Aunque el TPI reconoció que hubo una merma en su horario de trabajo en las dos (2) semanas subsiguientes a la *Orden de Protección*, dicha merma había respondido a una razón legítima y no represiva. Ante la alegación del Sr. Cruz de que luego del paso del Huracán María, sus horas disminuyeron mientras que las horas de sus compañeros de trabajo aumentaron, el TPI señaló que, aunque HJ Gas Station permitió que los empleados cercanos a HJ se reportaran voluntariamente a trabajar, el Sr. Cruz no aprovechó dichas oportunidades por inconvenientes personales que confrontó durante el desastre natural no relacionados a su patrono.

Inconforme con la *Sentencia*, el 26 de octubre de 2023, el Sr. Cruz presentó la *Apelación* ante nuestra consideración. En esta, hizo los siguientes señalamientos de error:

> **1. ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA EN LA APRECIACIÓN DE LA PRUEBA PRESENTADA DE LA VIOLACIÓN DEL PATRONO DE LA LEY NÚM. 284 DE 21 DE AGOSTO DE 1999 DE ORDEN DE PROTECCIÓN Y LA LEY 115 DE 20 DE DICIEMBRE DE 1991 DE REPRESALIA DEMOSTRANDO PARCIALIDAD Y PERJUICIO AL AQUILATAR LA MISMA INCURRIENDO EN ERRORES CLAROS Y MANIFIESTOS DONDE LAS CONCLUSIONES ESTÁN**

**EN CONFLICTO CON EL BALANCE MÁS RACIONAL, JUSTICIERO Y JURÍDICO DE LA TOTALIDAD DE LA EVIDENCIA RECIBIDA.**

**2. ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA EN LA APRECIACIÓN DE LA PRUEBA PRESENTADA DE LA VIOLACIÓN DEL PATRONO DE LA LEY 100 DE 30 DE JUNIO DE 1959 DE DISCRIMEN AL AQUILATAR LA EVIDENCIA PRESENTADA Y FORMULAR DETERMINACIONES DE HECHOS CONTRARIA A LA EVIDENCIA.**

**3. ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL AQUILATAR LA EVIDENCIA PRESENTADA Y FORMULAR DETERMINACIONES DE HECHOS ERRÓNEAS: POR EJEMPLO, DETERMINAR QUE LOS HECHOS OCURRIERON EN GARAJES DE GASOLINA EN ADJUNTAS, CUANDO REALMENTE ESTÁN UBICADOS EN JAYUYA, ENTRE OTROS ERRORES.**

**4. ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL APLICAR LA DOCTRINA DE COSA JUZGADA CUANDO DICHA DEFENSA NO FUE LEVANTADA EN LA CONTESTACIÓN DE LA QUERELLA POR LO QUE FUE RENUNCIADA CONFORME <u>RIVERA VS. JC PENNEY</u> 119 DPR 660 (1987), SE CITA ERRÓNEAMENTE <u>ACEVEDO VS. WESTERN DIGITAL</u> 140 DPR 452 COMO FUNDAMENTO PARA APLICAR LA DOCTRINA CUANDO EL CASO ESTABLECE LO CONTRARIO. ESPECÍFICAMENTE UNA INVESTIGACIÓN DE NORMAS Y SALARIOS NO CONSTITUYE COSA JUZGADA BAJO "<u>ACEVEDO</u>", Y BAJO UN FUNDAMENTO ERRÓNEO EXCLUYE EVIDENCIA IMPORTANTE Y POR ELLO LLEGA A CONCLUSIONES ERRÓNEAS EN DERECHO.**

Con la comparecencia de las partes y perfeccionado el recurso apelativo, procedemos a discutir el derecho aplicable a los errores señalados.

**II.**

**A.**

"[L]a sentencia que dicta un Juez de Primera Instancia es el producto final de un activo y complejo proceso forense". L. Rivera Román, *La apreciación de prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones* en *Perspectivas en la práctica apelativa*, San Juan, Ed. SITUM, 2018, pág. 101. Estas gozan de una presunción de corrección y la parte que impugne una determinación del Tribunal de Primera Instancia tiene el peso de la prueba para refutarla. *Íd.*

En vista de lo anterior, los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por el tribunal de instancia. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 740 (2007). Esta deferencia yace en que el foro primario está en mejor posición que un tribunal apelativo para realizar la determinación de credibilidad. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Se le impone un respeto a la labor del tribunal de instancia en aquilatar la credibilidad, dado que los foros apelativos sólo poseemos récords mudos e inexpresivos. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Pérez Cruz v. Hospital La Concepción*, 115 DPR 721, 728 (1984). Pues, en gran medida, la determinación de credibilidad depende de observar la manera en que la persona testigo declara, apreciar sus gestos, titubeos, contradicciones, entre otros factores que van formando gradualmente la convicción en cuanto a la verdad en la conciencia de la persona juzgadora. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67-68 (2009).

Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, 32 LPR Ap. V, R. 42.2, dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". De esta forma, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Sucn. Pagán Berrios v. UPR y otros*, 206 DPR 317, 336 (2021); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Se incurre en prejuicio, parcialidad o pasión, cuando la persona juzgadora actúa motivada "por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Además, "el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Ortiz Ortiz v. Medtronic, supra*, pág. 779.

De otra forma, únicamente se alterará el dictamen del tribunal de instancia en una circunstancia de error manifiesto cuando, de un examen detenido de toda la prueba, el foro apelativo esté convencido que la persona juzgadora descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios de escaso valor o inherentemente improbables o increíbles. *C. Brewer PR, Inc. v. Rodríguez*, 100 DPR 826, 830 (1972). Por ello, nuestra facultad para sustituir el criterio del foro primario está limitada a las instancias en las que, a la luz de la prueba admitida, no existe base suficiente para apoyar su determinación. *Ortiz Ortiz v. Medtronic, supra*. Por otro lado, los tribunales apelativos nos encontramos en la misma posición del foro primario para evaluar la prueba documental o pericial que fundamentan las determinaciones de hecho. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 918 (2016); *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

**B.**

Existe en nuestro ordenamiento jurídico y en la política pública de Puerto Rico un rechazo claro y contundente en contra de

los actos constitutivos del acecho. "El acecho constituye una forma de actividad criminal compuesta de una serie de actos que al ser examinados individualmente pueden parecer un comportamiento legal[...]", no obstante, "estos actos unidos a intentos de atemorizar, intimidar o hacer daño a una persona, o a miembros de su familia o a su propiedad, pueden constituir un patrón de conducta ilegal". Exposición de Motivos, Ley Contra el Acecho en Puerto Rico, Ley Núm. 284-1999, 33 LPRA sec. 4013 *et seq.* (Ley Núm. 284). En consecuencia, la Asamblea Legislativa aprobó la Ley Núm. 284 para establecer los mecanismos necesarios, tanto para el Gobierno como para la ciudadanía en general, para combatir, y protegerse de, el acecho. Artículo 2, *Íd.* Cónsono con este propósito, los Artículos 5 y 6 de la Ley Núm. 284 proveen un procedimiento para que una persona solicité una orden de protección.

En el 2006, la Asamblea Legislativa entendió necesario establecer una protección estatutaria a favor de empleados que solicitan órdenes de protección por acecho. Mediante la Ley Núm. 271-2006, se enmendaron los Artículo 1, 1-A, 2, 2-A y 6 de la Ley Núm. 100, *supra*, para prohibir el discrimen por ser víctima de violencia doméstica, agresión sexual o acecho, definiendo el acecho como la conducta tipificada en la Ley Núm. 284, *supra*. Por lo tanto, el Artículo 1 de la Ley Núm. 100, *supra*, dispone que incurrirá en responsabilidad civil:

> Todo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su status de empleado, [...] por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho [...].

> Artículo 1 (a), *Íd.*

Es patentemente incompatible con nuestro ordenamiento jurídico y principios constitucionales que una persona sea despedida de su empleo sin razón que lo justifique. La Constitución de Puerto Rico, Const. ELA [Const. PR], LPRA Tomo I, establece una política pública expresa y sin ambigüedades en contra del discrimen. La Sección 1, del Artículo II de la Constitución dispone que:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. **No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas**. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.

*Íd.* (Énfasis nuestro).

La prohibición de discrimen contenida en la Sección 1 opera *ex propio vigore*. "[S]e trata de un mínimo constitucional que debe ser puesto en vigor, independientemente de la existencia de una canalización estatutaria". J.M. Farinacci Fernós, *La Carta de Derechos*, 1ª ed. rev., San Juan, Ed. UIPR, 2021, pág. 58. "[L]o dispuesto en esta norma es de carácter **irrenunciable**, pues, más que un derecho individual, se trata de un mandato del sistema constitucional en cuanto al desarrollo de la sociedad y la conducta colectiva". *Íd.* (Énfasis en la original). En el ámbito laboral, nos dicen los profesores Charles Zeno Santiago y Víctor M. Bermúdez Pérez que los "patrones de conducta discriminatorios chocan seriamente contra los principios y valores éticos y morales de la sociedad". C. Zeno Santiago & V.M. Bermúdez Pérez, *Tratado de derecho del trabajo,* 1ª ed. rev., San Juan, Ed. SITUM, 2014, Tomo II, pág. 15. Por su parte, el Artículo 3 de la Ley Núm. 100 establece una presunción controvertible, disponiendo que "[s]e presumirá que cualquiera de los actos mencionados en las secciones precedentes fue cometido en violación [del Artículo 1, entre otros,] de este título, cuando el mismo haya sido realizado sin justa causa. Esta

presunción será de carácter controvertible". Dicha presunción opera

de la siguiente manera:

> [U]na vez presentada la demanda, le corresponde a la parte demandante en la vista en su fondo comenzar con la presentación de la prueba de sus alegaciones, antes de que la parte demandada venga obligada a rebatirla. Si la parte demandante no presenta prueba suficiente para sostener sus alegaciones, la parte demandada no tiene que defenderse, procede la desestimación de la demanda en esta etapa.
> [...]
> El peso de la prueba para establecer las bases de su reclamación le continúa correspondiendo inicialmente al empleado. **Éste tiene que comenzar presentando prueba que demuestre, primero, que hubo un despido o acto perjudicial**; segundo, que **éste se realizó sin justa causa**; y tercero, **algún hecho base que lo ubique dentro de la modalidad de discrimen bajo la cual reclama**. Una vez el empleado cumple con esta primera fase surge la presunción de discrimen del Art. 3. Es decir, **el empleado no tiene que probar el acto discriminatorio que es objeto de la presunción**.
> [...]
> [S]i el patrono decide defenderse, tiene varias alternativas. Éste puede presentar prueba que rebata la presunción de discrimen activada por el empleado; o puede optar por presentar prueba de que el despido fue justificado; o que no hubo tal despido; o que a pesar de haber habido un despido injustificado éste no fue discriminatorio.
>
> *S.L.G. Hernández-Beltrán v. TOLIC*, 151 DPR 754, 774-775 (2000). (Énfasis nuestro).

"Si el patrono no presenta prueba alguna en esta etapa, se

considera que el empleado ha probado su caso de discrimen, por lo

que **sólo resta la presentación de la prueba sobre los daños**". *Íd.*,

pág. 775. (Énfasis nuestro). De esta manera, el Tribunal Supremo

pautó los elementos esenciales con los cuales un empleado debe

cumplir para establecer un caso *prima facie* de discrimen. Estos son:

(1) que hubo un despido o acción perjudicial; (2) que éste se realizó

sin justa causa; y, (3) tiene que presentar evidencia indicativa de la

modalidad de discrimen que se vincula a su despido. *Íd.*, pág. 776;

*López Fantauzzi v. 100% Natural*, 181 DPR 92, 124 (2011); *Díaz v.*

*Wyndham Hotel Corp.*, 155 DPR 364, 389, esc. 44 (2001).

En el caso de una reclamación al amparo de la Ley Núm. 100,

"es inevitable la necesidad de establecer la intención del patrono,

por lo que **el factor [de] credibilidad desempeña un papel importantísimo en el resultado de la reclamación**". C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 344. (Énfasis nuestro).

### C.

Nuestro ordenamiento jurídico también establece una prohibición abarcadora en contra del despido sin justa causa. Así, el Artículo 2 de la Ley 80 dispone lo que constituye justa causa:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
>
> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
>
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
>
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
>
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.
>
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
>
> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.
>
> No se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni

constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una cantidad igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.

Artículo 2, *Íd.*

Cónsono con anterior, el Tribunal Supremo ha "reiterado, en un sinnúmero de ocasiones, que bajo las disposiciones de la referida Ley Núm. 80 constituye justa causa para el despido aquella que tiene su origen, no ya en el libre arbitrio o capricho del patrono, sino aquella vinculada a la ordenada marcha y normal funcionamiento de la empresa en cuestión". *Díaz v. Wyndham Hotel Corp.*, *supra*, págs. 376-377.

Ahora bien, la frase "despido injustificado" puede causar que se concluya incorrectamente que una acción al amparo de la Ley Núm. 80 no puede ser instada cuando un empleado renuncia a su puesto voluntariamente. Nuestro Tribunal Supremo ha dejado claro que no es un hecho indispensable que el patrono haya despedido al empleado o que su renuncia haya sido involuntaria. *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 907 (2011).

> [L]a definición de la Ley 80 es bastante amplia, pues **abarca, no sólo la acción unilateral del patrono dirigida a cesantear al empleado**, **sino las acciones dirigidas a *inducirlo o forzarlo a renunciar***, tales como imponerle o intentar **imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra**.

*Íd*. (Énfasis nuestro).

La renuncia de un empleado luego de que el patrono cree un ambiente laboral en el que un empleado no puede tolerar trabajar es conocido como el despido constructivo, y nuestro Tribunal Supremo lo ha considerado una manifestación del despido injustificado. "En el despido constructivo, al empleado se le obliga a renunciar mediante la imposición de condiciones onerosas". *Íd*. "El

ambiente en el empleo debe tornarse intolerable a tal nivel que la única alternativa razonable para el empleado afectado sea dimitir". *León Torres v. Rivera Lebrón*, 204 DPR 20, 39 (2020). "La intensidad y el alcance de la conducta patronal en controversia se examinarán desde una óptica objetiva y no desde la perspectiva del empleado promovente. Es decir, se evaluará 'si una persona razonable se sentiría forzada a renunciar como resultado de las acciones del patrono'". *Íd.* (citando a *Rivera Figueroa v. The Fuller Brush Co., supra*, pág. 908). No obstante, no podemos ignorar que las condiciones que un empleado considere onerosas no pueden estar justificadas. Por lo tanto, si existe justificación para cambiar las condiciones de trabajo, no se podrá constituir un despido injustificado.

### D.

La doctrina de cosa juzgada, también conocida como *res judicata*, es una defensa afirmativa, reconocida por la Regla 6.3 de Procedimiento Civil, *supra*. La misma responde al interés público de que se mantengan firmes las adjudicaciones y que se evite que se someta a una persona a los rigores del proceso judicial en múltiples ocasiones para litigar una misma causa. R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ª ed. rev., San Juan, Ed. LexisNexis de Puerto Rico, 2017, pág. 3. "Para la aplicación de la doctrina de cosa juzgada, es requisito que la determinación judicial que precede se haya adjudicado en los méritos". *Íd.*

Para que prospere la doctrina de cosa juzgada, debe existir la más perfecta identidad de las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron. En *Presidential v. Transcaribe*, 186 DPR 263 (2012), el Tribunal Supremo tuvo la oportunidad de analizar cada uno de estos requisitos. "Para aplicar la doctrina de cosa juzgada, el requisito de la identidad de cosas

significa que el segundo pleito se refiere al mismo asunto del que versó el primer pleito, aunque las cosas se hayan disminuido o alterado[; ...] es el objeto o materia sobre la cual se ejercita la acción". *Íd.*, pág. 274. El requisito de identidad de causas se refiere al "motivo que tuvo el demandante para pedir. La identidad de causa existe cuando los hechos y los fundamentos de las peticiones son idénticos en lo que afecta a la cuestión planteada". *Íd.*, pág. 275. En cuanto a la identidad de las personas y sus calidades, el Tribunal Supremo determinó que "los efectos de la cosa juzgada se extienden a quienes intervienen en el proceso, a nombre y en interés propio". *Íd.*, pág. 276.

No obstante los efectos de la doctrina de cosa juzgada sobre un asunto en controversia, no podemos obviar que esta constituye una defensa afirmativa conforme la Regla 6.3 de Procedimiento Civil, *supra*. Por lo tanto, esta debe ser convocada en la primera alegación responsiva o se entenderá renunciada. Los tribunales no pueden levantar, *motu proprio*, las defensas afirmativas que el demandado renunció, salvo la defensa por falta de jurisdicción sobre la materia.

**E.**

Ningún empleado podrá ser castigado por ofrecer testimonio ante un foro judicial o administrativo. Así, la Ley Núm. 115, *supra*, "establece para el empleado una causa de acción en contra de su patrono cuando este lo ha despedido, amenazado o sometido a algún discrimen en el empleo por haber ofrecido testimonio ante un foro legislativo, administrativo o judicial". C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 360. La Ley Núm. 115, además, tuvo el efecto de enmendar la Ley Núm. 80 para establecer que el hecho de que un empleado ofrezca testimonio o presente quejas ante uno de los foros contemplados por la ley no constituye justa causa para su despido. El Artículo 2 (a) de la Ley Núm. 115 describe la conducta proscrita. Esta dispone que:

> Ningún patrono podrá despedir, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, verbalmente o por escrito, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

Artículo 2 (a), Ley Núm. 115, *supra.*

El Artículo 2 (c), por su parte, establece que un empleado tiene dos vías para establecer un caso al amparo de la Ley Núm. 115: (a) probar la violación mediante evidencia directa o circunstancial, o (b) establecer la presunción *juris tantum* de la ley. "Un empleado establece un caso *prima facie* o una presunción a su favor cuando prueba que: (1) participó en una actividad protegida por la ley y (2) subsiguientemente fue despedido, amenazado o discriminado en su empleo". *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 362 (2009).

### III.

En su comparecencia, el Sr. Cruz señaló cuatro errores, los primeros tres relacionados con la apreciación de la prueba y determinación en su contra. El cuarto error trata sobre la determinación que no procedía la acción solicitando la compensación de horas trabajadas pero no pagadas, por aplicar la doctrina de cosa juzgada. Adelantamos que no se cometieron los errores señalados.

Por esta íntimamente relacionados, atenderemos los primeros tres errores en conjunto.

Como hemos señalado, todo empleado tiene una protección y goza de garantías, tanto constitucionales como estatutarias, en

contra del discrimen en el ambiente laboral. Mediante las Leyes Núm. 284, *supra,* 271-2006, *supra,* 100, *supra,* y 115, *supra,* la Asamblea Legislativa ha extendido dicha protección al discrimen como resultado de ofrecer testimonio en un foro judicial o ser la víctima del acecho. Por lo tanto, para prosperar en una acción por discrimen, un empleado afectado debe, en primer lugar, establecer un caso *prima facie* por discrimen al amparo de la Ley Núm. 100.

Para establecer un caso *prima facie* por discrimen, el empleado debe, mediante su primer turno de la prueba, demostrar que su causa cumple con los siguientes requisitos: (1) que hubo un despido o acción perjudicial; (2) que éste se realizó sin justa causa; y, (3) tiene que presentar evidencia indicativa de la modalidad de discrimen que se vincula a su despido. Con relación al primer requisito, no es necesario que el empleado haya sido despedido en el sentido literal de la palabra, sino su separación de la empresa podrá surgir como resultado de un despido constructivo. Por otro lado, para cumplir con los requisitos del caso *prima facie* al amparo de la Ley Núm. 115, el empleado debe demostrar que: (1) participó en una actividad protegida por la ley y (2) subsiguientemente fue despedido, amenazado o discriminado en su empleo.

Según la prueba presentada por el Sr. Cruz, él cumplió con los requisitos para establecer los casos *prima facie* al amparo de las leyes citadas. En cuanto a la Ley Núm. 115, surge que luego de que el Sr. Cruz ofreció su testimonio ante el Tribunal Municipal de Adjuntas, en su solicitud de la *Orden de Protección* en contra de Isael Guzmán, sus condiciones de trabajo fueron afectadas y su horario laboral disminuyó. Por otro lado, con relación con los requisitos para una causa de acción al amparo de la Ley Núm. 100, el Sr. Cruz demostró que renunció de su empleo por un alegado discrimen al haber sido víctima de acecho. Alegó que su patrono, HJ Gas Station, cambió sus condiciones de trabajo, redujo sus horarios y fomentó

las condiciones que lo llevaron a la renuncia, sin existir justificación para aquello.

Ahora bien, el hecho de que se hayan probado casos *prima facie* al amparo de las leyes antes citadas no quiere decir que el Sr. Cruz automáticamente prosperó en su reclamación. Recordemos que al establecer un caso *prima facie*, surge una presunción rebatible a favor del discrimen o de la represalia. Ante esto, el patrono tiene el deber de presentar la prueba necesaria para establecer que la conducta alegada estuvo justificada. Cumpliendo con esto, el patrono derrota la presunción y prevalece su defensa.

En su turno, HJ Gas Station presentó la prueba necesaria para rebatir y derrotar la presunción establecida. En primer lugar, logró demostrar y convencer al foro de instancia que las razones por los cambios a las condiciones de trabajo del Sr. Cruz fueron necesarias y justificadas. En particular, el Sr. Cruz alegó que el Apelado tomó represalias en su contra por haber solicitado una *Orden de Protección*. Aunque sus horas trabajadas disminuyeron en las dos (2) semanas posteriores a la *Orden de Protección*, esta disminución fue justificada como medida razonable para separar al Sr. Cruz de su agresor. El Apelado también logró demostrar que antes de desistir voluntariamente de la *Orden de Protección* y de efectuarse una reunión entre el Sr. Cruz y su patrono, sus horas trabajadas y compensadas volvieron a la normalidad. Esto fue reflejado por los talonarios y ponches sometidos como prueba.

Por otro lado, para el 2017, el Sr. Cruz alegó que en marzo, HJ Gas Station le quitó su turno de trabajo en la gasolinera DJ y que entre septiembre y diciembre de 2017, trabajó menos horas en lo que sus compañeros de trabajo se mantuvieron en sus horarios o aumentaron sus horas. No obstante, los cambios realizados posteriormente a septiembre fueron justificados por las condiciones tras el paso del Huracán María. Dichos cambios fueron el resultado

del toque de queda impuesto, que limitó el turno nocturno del Sr. Cruz. Además, sus compañeros de trabajo lograron mantener sus horarios originales o aumentar su trabajo puesto que HJ Gas Station implementó una política que permitió a los empleados comparecer voluntariamente en cualquier turno que quisieran. Surge de la prueba que el Sr. Cruz no aprovechó esta nueva política, por lo que no pudo recuperar las horas perdidas como resultado de los ajustes necesarios a las operaciones del negocio. También surge que en todo momento, el Sr. Cruz fue compensado por más horas de lo que había ponchado como trabajadas.

Por otro lado, el TPI destacó que en su carta de renuncia, fechada 26 de diciembre de 2017, el Sr. Cruz no levantó algún reparo con su patrono. Fue posterior a su renuncia que alegó que el desistimiento de la *Orden de Protección* y la renuncia fueron producto de cambios en sus condiciones de trabajo. En particular, alegó que su desistimiento fue el producto de un acuerdo al que había llegado con HJ Gas Station para obtener mejores condiciones de trabajo. No obstante, le dijo al Tribunal Municipal que su desistimiento fue uno voluntario y libre de coacción. También surge de la prueba que antes de que se celebrara la vista de desistimiento, las condiciones de trabajo del Sr. Cruz habían vuelto a la normalidad y no fue posterior a su desistimiento que se celebró la mediación con HJ Gas Station.

En el ejercicio de analizar las determinaciones de hechos realizadas por el TPI, debemos tener como principio rector que estas son el producto final de un activo y complejo proceso forense. En el caso de autos, el TPI celebró varios días de vistas, en las cuales las partes sentaron testigos, desfilaron prueba documental y presentaron sus argumentos. En su labor como juzgador y apreciador de la prueba, el TPI estuvo en una posición privilegiada para auscultar la credibilidad de los testigos, incluyendo la del Sr.

Cruz, quien se sentó a testificar. La credibilidad de la parte apelante quedó severamente lesionada ante el foro de instancia, al Sr. Cruz admitir que le había mentido previamente al tribunal, durante su vista ate el Tribunal Municipal de Adjuntas. En ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario.

Por otro lado, la parte apelante señala que las determinaciones de hecho del TPI son contrarias a la prueba desfilada y aducen error. En particular, señala como ejemplo que el TPI, en reiteradas ocasiones, señala que los negocios de HJ Gas Station están localizados en Adjuntas, cuando en realidad están en el municipio de Jayuya. También señala que el TPI citó sentencias del Tribunal de Apelaciones como fuentes de derecho e hizo referencias a defensas renunciadas. Resulta forzoso concluir que estos errores no impactan de manera sustancial o determinante las conclusiones del TPI. Además, es importante puntualizar que la propia Regla 11 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 11(D), dispone que aunque las determinaciones de este Tribunal no crean precedente, tienen fuerza de ley y podrán ser citadas de manera persuasiva.

En resumen, el TPI no cometió error al hacer sus determinaciones de hechos. Surge de la prueba que las determinaciones sustanciales y determinantes para las causas de acción del Sr. Cruz fueron sustentadas por la prueba desfilada y creída por ese Tribunal. Las determinaciones que contradicen la prueba podrán ser corregidas por una enmienda *nunc pro tunc* al amparo de la Regla 49.1 de Procedimiento Civil, *supra,* sin efectos ulteriores a lo resuelto.

En cuanto al cuarto error señalado, el Sr. Cruz señaló que el TPI erró al excluir la prueba relacionada con el proceso ante el Departamento de Trabajo y Recursos Humanos por esto haber sido resuelto previamente. Señaló que la parte apelada no levantó oportunamente la defensa de cosa juzgada. No se cometió el error.

Sabido es que la defensa afirmativa no levantada en una alegación responsiva queda renunciada. Es menester que, para que proceda la defensa de cosa juzgada, HJ Gas Station debió haberla levantado en su respuesta a la querella. No existe duda de que no lo haya hecho.

No obstante, el TPI no hizo referencia a la doctrina de cosa juzgada para eliminar la prueba presentada, sino para señalar que no procede un doble remedio por la controversia de las horas extras trabajadas y no compensadas, toda vez que había resuelto por el DTRH. En el caso de autos, el Sr. Cruz levanta lo resuelto en el foro administrativo como prueba para probar sus alegaciones ante el TPI. Surge de su propia *Sentencia* que el TPI admitió lo resuelto en el foro administrativo únicamente para estos propósitos probatorios. No estuvo en controversia ante el foro judicial si procedía la concesión de un remedio. Contrario a lo que esperaba la parte apelante, a dicha prueba no se le otorgó gran valor probatorio por parte del TPI. Ante esta situación, no aplica lo resuelto por el Tribunal Supremo en *Acevedo v. Western Digital Caribe Inc.*, 140 DPR 452 (1996). Por lo tanto, no se cometió el error.

**IV.**

Por los fundamentos discutidos, confirmamos la *Sentencia* del TPI.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones